UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 FEB 17  3: 02

United States District Court
District of Connecticut
FILED AT        NEW HAVEN

3/4/04                    20

Kevin F. Rowe, Clerk

By R. Malone
Deputy Clerk

SAKKARA BOGLE-ASSEGAI          :
PLAINTIFF,                      :      CIVIL ACTION NO.
                                :      301CV2366(JCH)
                                :
V.                              :
                                :
LISA MARIE BIGELOW,             :
In her individual capacity,     :
                                :
And                             :
                                :
MARK O'DONNELL                  :
In his individual capacity      :
DEFENDANTS,                     :      FEBRUARY 17, 2004

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FACTS

The Plaintiff, Sakkara Bogle-Assegai, is a gifted and talented student. (Exhibit 22). She

participated in the gifted and talented program at Bloomfield High School and is accomplished in

the performing arts. The Plaintiff has also participated in several competitive programs that

complemented her academic achievement. (Exhibit 29). In June 1999 the Plaintiff was accepted

to the Capitol Region Education Council (CREC) International Studies Modern Pacific/Asia

1

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

summer program (MPASP). This program was taught through the Center for International

Education, a department within the Academic Affairs Division of Central Connecticut State

University. (Exhibit E).

The CREC Summer Program was a residential program that required participants to stay

overnight in a dormitory, rooming with other young people from the Connecticut region covered

by CREC. (Exhibit Q). The students were to spend the weekends at home.

Participating students received a Student-Parent Handbook at the beginning of the

program. The book was developed by Defendant, Lisa (Fellage) Bigelow. It stated in pertinent

part:

"While you are living in our dormitories and learning in our classrooms, I encourage you

to engage yourself with all facets of this exciting program. Whether through classroom

discussion with your peers, lively debate with your faculty, or casual conversation over dinner, I

guarantee you will graduate from this program with a broader perspective about one of the

fastest growing regional economies of the world." Richard Judd, President of Central

Connecticut State University. In addition, it states: "You will be encouraged to work

independently and learn how to examine your own ideas about culture, diversity, and

intercultural sensitivity." Lisa (Fellage) Bigelow and Mark O'Donnell.

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

The program began on Monday July 5, 1999 and was scheduled to run through August 30, 1999. (Exhibit Y). The parent-student orientation took place on Thursday July 1, 1999 and was moved from its scheduled location, without notice to parents. Thus, when plaintiff's mother arrived for the orientation, she was unable to locate the meeting and therefore, was unable to attend. (Exhibit 30).

Student arrival was scheduled for Monday July 5, 1999. Plaintiff was taken to the MPASP following her successful completion of the International Scholar Athlete Program at the University of Rhode Island; where over 2,000 students from throughout the world participated. (Exhibit 29). Classes for the summer program began on Tuesday July 6, 1999. The Plaintiff attended classes on Tuesday and Wednesday. During the first three days of the program the Plaintiff noticed that some of her Caucasian peers and some of the faculty were treating the African American and Latino students differently than the Caucasian students. (Exhibit 25 and 30).

On Wednesday July 7, 1999 an incident occurred at the boys dormitory. (Exhibit I). Specifically, five young Caucasian male students wrote negative racial statements and posted them in the common area in the dormitory. (Exhibit I) The Program's Residential Life Director, Christopher Perruccio saw the racial statements posted, removed the poster, and thereafter destroyed the evidence. He indicated that the poster "could be construed as racist." (Exhibit I).

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

Other students in the dormitory also saw the statements posted in the dormitory. It was reported that among other phrases, it said "niggers and Puerto Ricans out, Jews out, Whites are best." ( Exhibit 2). There was only one poster. (Exhibit I)

This information was devastating to the Plaintiff. On the evening of Thursday July 8, 1999, Plaintiff and her roommate telephoned her parents extremely distraught and relayed the racial incident to them. (Exhibit 30, Exhibit 25). The Plaintiff also told her parents about the general manner in which the Black and Puerto Rican students were being treated by their Caucasian peers and some members of the faculty. (Exhibit 25).

On Thursday July 8, 1999 the program directors suspended classes and held a "town meeting" to discuss the racial incident that transpired the night before with all of the program participants. Students were given an opportunity to speak during the "town meeting". The students were told at that time that the young Caucasian men were only playing a game and that the boys were disciplined and the matter was taken care of. The Plaintiff took advantage of the opportunity given during the "town meeting" to express her sentiment regarding the racial incident and the dismissive way in which it was handled. (Exhibit 2).

Following the meeting, the Plaintiff and two of her friends went to Lisa Bigelow and Susan Lesser to express their discontent about the dismissive manner in which the incident was handled. (Exhibit 2). They also stated their concerns about the overall manner in which the

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

Black and Puerto Rican students were being treated by their Caucasian peers and some members of the faculty since the beginning of the program. (Exhibit 25 and 30). Plaintiff's mother spoke to Rhonda Patman every day from July 6th to July 9th about how the Black and Latino students were being treated by some faculty and Caucasian students. (Exhibit 25).

On Thursday July 8, 1999, after the "town meeting" and after speaking to the Plaintiff, Lisa Bigelow met with other CREC and CCSU staff and determined that the Plaintiff should be dismissed from the program. (Exhibit W). The reason that she gave was that the plaintiff was a "disruptive" student. Therefore, merely hours after the Plaintiff engaged in a protected activity in complaining about a racially hostile environment, the Defendant, made a decision to dismiss the Plaintiff from the program. (Exhibit W). Plaintiff was dismissed the day after she opposed what she reasonably believed to be a racially hostile environment. The Defendant had not at any time given the Plaintiff either a verbal warning or a written warning regarding the possibility of being dismissed from the program. (Exhibit W).

On Friday July 9, 1999, the Plaintiff's mother wrote a letter to CREC staff relaying the racial incident and the manner in which it was handled. (Exhibit 25). This was a result of the telephone conversation that she had with Plaintiff the night before.

Also on Friday July 9, 1999, the Plaintiff's parents arrived at CCSU to pick up the Plaintiff for the weekend. At that time Lisa Bigelow met both parents and Plaintiff at the

5

elevator, invited them into a room with others, and informed Plaintiff's parents that the Plaintiff was dismissed from the program. She thereafter handed the parents a letter stating same. (Exhibit 26). Lisa Bigelow simply told the parents that a decision was made that the Plaintiff would be dismissed from the program. At no time whatsoever did Defendant Bigelow give the verbal or written warning to the Plaintiff as prescribed in the student handbook. At no time whatsoever did Defendant Bigelow ever tell the Plaintiff's parents that they had an opportunity to be heard on this matter. (Exhibit 26). In fact, the July 9, 1999 letter of Dismissal from the Program dismissed Plaintiff and made it clear that Dr. O'Donnell of CREC supported the decision of Lisa Fellage (Bigelow) to dismiss Plaintiff (Exhibit 26). No appeal process was provided to the parents (Exhibit 26).

The parents attempted to solicit the intervention of Mark O'Donnell, the CREC administrator responsible for the Asia/Pacific program, to no avail. (Exhibit 18).

The Student-Parent handbook outlines the specific procedures to follow for disciplinary actions. It states in pertinent part: "Unless otherwise noted, the disciplinary actions to be taken are as follows: 1st violation: verbal warning to student; 2nd violation: written warning sent to parent/guardian; 3rd violation: dismissal from Summer Program." (Exhibit Q). Lisa Bigelow did not follow the disciplinary procedures outlined for the students. The procedure was posted to the students and they had notice, but Lisa Bigelow did not follow the procedural guidelines that she

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

herself wrote. (Exhibit 26 and Exhibit F). Further, according to Christopher Marsh, a teacher in the program, there was a demerit system which was never implemented in plaintiff's case. (Exhibit 12).

Both the Plaintiff and her parents were shocked to find out that the Plaintiff had been dismissed from the program. The family at the direction of Dr. Assegai, decided to leave immediately, recognizing there was no recourse possible that afternoon. On their way out of the campus in the parking lot, they came into contact with a university police officer, and they reported that a racial incident occurred on the campus.

Plaintiff's parents, on Saturday, July 10, 1999, requested by way of a letter directed to CREC staff, that the Plaintiff be reinstated to the program. (Exhibit 18). The parents received no response. Further the Parents were never informed that they would be given an opportunity to be heard; neither were they ever told that they already utilized their opportunity to be heard prior to the initiation of this litigation. (Exhibit 30). In fact, Plaintiff's mother was told by Dr. Mark O'Donnell, that he had been advised that the matter was now in the hands of the attorneys for CREC. (Exhibit 30).

There were forty-seven students that participated in the summer 1999 Modern Pacific Asian Program at Central Connecticut State Universtity. Forty-six of the forty-seven students completed the program and received three credits. However, Plaintiff never received credits and

7

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

was dismissed from the program for having complained about discrimination and racial animus.

Plaintiff continued to receive invitations to participate in CREC programs. (Exhibit 29).

### LEGAL ARGUMENT

### A.    STANDARD FOR SUMMARY JUDGMENT

In ruling on a motion for Summary Judgment the court may only grant the motion pursuant to

Fed.R.Civ.P. 56(c), "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there are no genuine issues as to any material

fact and that the moving party is entitled to judgment as a matter of law." The moving party

bears the initial burden of demonstrating the absence of any genuine issue of material fact as to

an essential element of the opposing party=s claim. Celotex v. Catrett, 477 U.S. 317, 323

(1986). In determining whether the moving party has met its burden, the court must view the

evidence in the light most favorable to the nonmoving party. Matsushita Electric Indus. Co.

Zenith Radio Corp. 475 U.S. 574 (1986).

To preclude summary judgment, the nonmoving party "is required to present some

significant probative evidence that makes it necessary to resolve the parties= differing versions

of the dispute at trial." Gaines v. Runyon, 107 F.3d 1171 (6th Cir.1997). The nonmoving party

must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." Anderson v Liberty Lobby, Inc. 477 U.S. 242, 249 (1986). To determine

8

whether the nonmoving party has raised a genuine issue of material fact, the evidence of the

nonmoving party is to be believed and all justifiable inferences drawn in his favor.

B.    THE PLAINTIFF HAS MET EACH AND EVERY ELEMENT TO ESTABLISH
      HER FIRST AMENDMENT CLAIM OF RETALIATION

Section 1983 of Title 42 of the United States Code establishes liability for deprivation under

the color of state law "of any rights, privileges, or immunities secured by the Constitution." In

Mount Healthy School Dist. v. Doyle, 429 U.S. 274, 287(1977), the Supreme Court established

the standard for a Section(s) 1983 claim where a state actor retaliated against a plaintiff for

exercising a constitutional right.

To establish a prima facie case of First Amendment retaliation, a plaintiff must apply a three

prong test and must establish 1) that the speech or conduct at issue was protected, 2) that the

defendant took adverse action against the plaintiff, 3) that there was a causal connection between

the protected speech and the adverse action.  Morales v. Makalm, 278 F.3d 126, 131 (2d Cir

2002).

In the present case, the Plaintiff engaged in constitutionally protected speech in that she

made a complaint about discrimination and racial animus. (Exhibit 18).  The plaintiff complained

publicly, in the open "town meeting".[1]  She lodged her complaint regarding the handling of the

---

[1] Affidavit from Susan Lesser: "During the town meeting, Sakkara thought that the random poster participants that the program should have kicked them out and they were not kicked out because they were white."

9

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

racial incident to Lisa Bigelow directly. [2] The Plaintiff's parents complained on her behalf to CREC staff once they heard about the racial incident at school. Plaintiff's parents were in contact with Rhonda Patman of CREC about the racial animus in the environment. (Exhibits 18 and 30). The Plaintiff clearly satisfies the first prong of the test because lodging a grievance is protected activity. Graham v.Henderson, 89 F.3d 75, 80 (2d Cir. 1996).

The second prong of the test is to establish whether the defendant took an adverse action against the plaintiff. Clearly, being dismissed from a program constitutes an adverse action. But more importantly, this dismissal had the effect to deter or eliminate the Plaintiff from lodging any other grievances. The second prong of the test has been satisfied. Morales v. Makalm, 278 F.3d 126, 131 (2d Cir 2002).

The third prong of the test is to determine whether there was a causal connection between the protected speech and the adverse action. The causal connection must be sufficient to support the inference `that the speech played a substantial part' [in the adverse action]." (quoting Ezekwo

---

[2] In Sakkara Bogle Assegai's Deposition, 6/19 2003, p 71
   Q. Let me make sure I herd your answer. I'm not sure I did. You told Fellage-Bigelow that the poster said, "Jews, niggers, Puerto Ricans out"
   A. Yes. . . .
   Q. What else did she tell you?
   A. I just told you.
   Q. Repeat it for me so I can hear it again.
   A. She said that the situation was handled, the boys said that they were playing, it seemed, she said it was a game, or they said it was a game and that's it; but then I told her that many students feel, who are of these races, feel that it was rude or discriminative, racially discriminative, and me, myself also. I asked her what was going to happen to the boys, and were they going to be placed out of the program. She said, "Don't worry about that", but she doesn't believe so.

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

v. NYC Health & Hosp. Corp., 940 F.2d 775, 780-91 (2d Cir. 1991)).  The facts demonstrate that

all of the events occurred within days of each other. To wit:  Wednesday, July 7, 1999 five

Caucasian boys posted in the common area in the boys dormitory a poster.  It was reported that

the poster said, "Niggers and Puerto Ricans out, Jews out, Whites are best."(Exhibit 2).

Thursday, July 8, 1999, Plaintiff expressed her feelings publicly to the students in the "town

meeting" and privately to Defendant Bigelow regarding the racial incident that occurred the

previous day. CREC staff determined that the boys were just playing. (Exhibit I).  Friday,  July 9,

1999,  Plaintiff is dismissed from the program.  All of the forgoing events happened "close in

time" to the complaint about discrimination.  The standard utilized in the Second Circuit has

been that the protected activity must be "closely followed in time by the adverse action."

Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590 (2d Cir.

1988).

     Plaintiff meets the second prong of her burden to survive summary judgment, showing as

a genuine issue of material fact that the protected conduct was a substantial or motivating factor

in her being dismissed.  Plaintiff's claim of retaliation is not simply a conclusory allegation.  The

facts as Plaintiff allege provide that there was an incident that occurred at the school on

Wednesday,  July 7, 1999 that involved racial slurs and that Defendant concedes contained

"culturally insensitive" statements.  Shortly thereafter Plaintiff lodged discrimination complaints

11

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

by complaining publicly and privately regarding the racial animus and the way that the poster issue was handled.  These actions give rise to an inference that the defendant disciplined Plaintiff (dismissing her from the program) in retaliation against her for her leadership in opposing the way the matter was handled by the CCSU staff.

The defendant argues that this inference is unreasonable because she had no possible motive for wishing to retaliate against the Plaintiff.  Rather, the defendant argues simply that the Plaintiff was a "disruptive student" and that her behavior warranted circumventing the mandated verbal warning, bypassing the mandated written warning and required an immediate dismissal (Exhibit F).   This reason is simply a pretext to the retaliatory behavior that was exhibited in dismissing Plaintiff from the program.  (Exhibit 18).

The Plaintiff has always received positive recommendations and good reviews from teachers regarding her demeanor and behavior in school. (Exhibit 22).   Professor Marsh was one of the instructors during the summer program.  He said, "she [plaintiff] seemed to treat me with respect. . . she never exhibited a behavior which I would consider rude, calling me bad names, for instance, outwardly disregarding any statement I made to her. . . ."[3] (Exhibit C)

More incredibly, the Defendant further claims the Plaintiff's behavior rose to such a level that an experienced and veteran teacher of thirty years was forced to resign from the program as

---

[3] Professor Marsh's Deposition pg 20 states " She [Plaintiff] was not confrontational to me in the way these other students were. . . And they would also repeatedly talk and then when we told them to be quiet, they would be quiet for a few seconds and start talking again. . . . But Sakkara did not do this by and large.

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

an instructor because of the behavior a 14-year-old female student (plaintiff) in the one class in which he encountered Plaintiff for one hour out of the entire time Plaintiff was in the program. (Exhibit N). This assertion is simply not credible. These assertions surrounding the Fitzsimmons resignation surfaced more than two years after the incident occurred, following the death of Fitzsimmons. (Exhibit N)

Furthermore, the Plaintiff played a unique role and can be distinguished as the only student in the program that complained both publicly and privately about discrimination and the racial incident. It cannot be said that as a matter of law this unique role cannot provide a motive for retaliation. The Plaintiff has satisfied the third prong of the test.

The Plaintiff's lodging her grievance coupled with the short time frame between the grievance, the dismissal from the program and defendant's lack of due process in failing to follow their own progressive discipline policies, (Exhibit F) further supports an inference that defendant had a retaliatory motive. *Cf.* Dawes, 239 F.3d at 492 (plaintiff's "failure to set forth a time frame for the alleged events . . . precludes inference of a causal relationship"). Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." ACLU v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993). The dismissal of the Plaintiff from the program had a chilling effect on the remaining African-American and Latino students. Evelyn

13

Garcia, parent to one of the Puerto Rican students stated in her Affidavit that she "felt intimidated by the administrators of the program, especially Lisa Fellage (Bigelow). She made me to feel powerless to do anything about the racial issues my daughter was complaining about, because she realized that I did not want Dionne to be dismissed from the program." (Exhibit 27).

The retaliatory actions of the Defendant are further exemplified in the legal argument in Defendant Bigelow and Defendant O'Donnell's Motion for Summary Judgment. The defendants have misplaced their focus on this argument and inserted a "red herring" in the argument in its discussions surrounding Dr. Assegai. Susan Lesser indicated that she was warned that the Assegai family are "media hounds", and have a history of being "unreasonable".[4] (Exhibit 33). The Defendant and the CREC staff approached the meeting with preconceived ideas as to what would transpire. It is apparent from Defendant's Motion for Summary Judgment, that the retaliation that was experienced by the Plaintiff was in fact really directed at the Plaintiff's parents.

It is uncontroverted that on Thursday, July 8, 1999 Plaintiff and two of her friends called Plaintiff's parents distraught regarding the poster incident. The following morning July 9, 1999 Plaintiff's mother wrote a letter to CREC staff, faxed it from home into the CREC office and began making telephone calls regarding following up on the racial poster incident.(Exhibit 13).

---

[4] The defendant goes through lengths to disparage the reputation of the Plaintiff and to mislead the Court. Dr. Kuba Assegai is not a party to this case and should not be the focus of any inquiry.

14

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

The CREC office received the letter and the telephone calls on Friday July 9, 1999 in the morning. Defendant Bigelow had ample time to be contacted by the CREC office regarding the poster incident. Defendant Bigelow's action in dismissing Plaintiff from the program was retaliatory and further fueled in retaliating against the actions of Plaintiff's parents. Indeed, CCSU's letter of dismissal specifically stated that CREC (Mark O'Donnell) had been contacted and was in agreement with the decision to dismiss Plaintiff. In other words, Defendant Bigelow's July 9, 1999, dismissal letter foreclosed Plaintiff's re-entry options. (Exhibit 26).

The Plaintiff has met her burden in demonstrating that there are genuine issues of material fact in dispute as it relates to the First Amendment Claim of Retaliation.

C.     THE PLAINTIFF WAS NOT GIVEN PROPER DUE PROCESS OR AN OPPORTUNITY TO BE HEARD REGARDING THE ABRUPT DISMISSAL FROM THE CREC SUMMER PROGRAM.

In general, the nature and contours of a specific property interest are defined by some source independent of the Constitution — most often state law. Board of Regents v. Roth, 408 U.S. 564, 577,92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The term "'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" Sindermann, 408 U.S. at 601, 92 S.Ct. at 2699 (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the

15

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

benefit and that he may invoke at a hearing." Id. (citation omitted). As the Roth Court declared: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . . He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709.

The Plaintiff has a legitimate property interest in completing the program. Successful completion would grant three high school credits. Plaintiff had to take additional courses in order to obtain the credits that she would have received but for the dismissal from the program (Exhibit A: and Plaintiff's School Transcripts for Academic Year 1999-2000 - transcripts under seal).

The Assegai family arrived at CCSU on Friday July 9, 1999, with the intent to pick up their daughter. (See Exhibit 7). The faculty should have followed the expressed rules and guidelines for: 1) giving the student a verbal warning and 2) sending written notice to the parents and discussing the issues with them.

Plaintiff's mother and father were repeatedly ignored by the Program Director. They were expressly told that the Plaintiff was dismissed from the program without any further discussion. The dismissal letter did not offer any advisement of the possibility of discussion with the parents. (See Exhibit 26) Professor Marsh stated that the decision to dismiss Plaintiff was made prior to the arrival of her parents. (See Exhibit L and Exhibit 26)). The professor further

16

Cynthia R. Jennings, Esquire (ct21797)<br>
THE BARRISTER LAW GROUP, LLC<br>
211 State Street; Bridgeport, CT 06604<br>
(203) 334-4800; (203) 368-6985 (FAX)<br>
cynthia.Jennings@sbcglobal.net

stated that his opinion as to whether Plaintiff should stay in the program would depend 100% on the way Dr. Kuba Assagai and Plaintiff reacted to "their" statements.  (See Exhibit R).

Professor Marsh states that an opportunity was given to another student and their parents before the decision was made to dismiss Plaintiff.  (See Exhibit S).  Also there was another student who was referred to as Student #2 who was disruptive, and Student #3 who got caught sneaking around in an unauthorized area of the campus in the early part of the morning (Exhibit H).  If, in the alternative, the Plaintiff is found to have been "talking excessively", then she should have been afforded the proper procedural safeguards to remain in the Program that Student #2 and Student #3 were given.  Plaintiff was the only student dismissed from the program.  Plaintiff was never given adequate notice of the intended action nor was she ever given an opportunity to be heard.

Clearly, as it relates to the issue of due process there are genuine issues of material facts in dispute and Summary Judgment should fail.

D.    THE PLAINITFF HAS PLEAD VIABLE STATE CLAIMS PURSUANT
       TO §46a-75

Conn. Gen. Stat. 46a-75 provides:
(a) All educational, counseling, and vocational guidance programs. . . of state
     agencies or in which state agencies participate, shall be open to all qualified
     persons, without regard to race, color, religious creed, sex, age, national origin,
     ancestry. . . .

17

(b) Such programs shall be conducted to encourage the fullest development of the interests, aptitudes, skills, and capacities of all students and trainees, with special attention to the problems of culturally deprived, educationally handicapped, learning disabled. . . .

In the present case, the summer program offered by CREC is a program in which Central Connecticut State University, a state agency, participates. Therefore, CREC falls under the auspices of §46a-75 within the meaning of the statute.

The Plaintiff's participation in the program was necessary for the triggering of this statute. The defendant and the CREC program had a responsibility to the Plaintiff. The conduct that they exhibited against the Plaintiff was discriminatory. It did not allow for the "fullest development of the interests, aptitudes and skills of the Plaintiff." Defendant's conduct in fact inhibited the Plaintiff's growth and actually retaliated against her for exercising her fundamental rights.

Based on the facts in this matter, the Plaintiff has pled a viable claim pursuant to the statute, and the State claim must stand.

E.    QUALIFIED IMMUNITY DOES NOT APPLY TO DEFENDANT BIGELOW OR MARK O'DONNELL IN THEIR INDIVIDUAL CAPACITY

Section 1983 provides a remedy to any citizen of the United States or other person within the jurisdiction thereof" who has been deprived "of any rights, privileges or immunities secured by the Constitution or laws" by a "person" acting "under color of" state

18

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

law.    Under §1983 a person does not get the benefit of qualified immunity if he is sued in

his individual capacity.    Hafer v. Melo, 502 U.S. 21,31 (1991).

In this case, the defendants were sued in their individual capacity.  No qualified immunity

applies, and the claims must remain pending.  The issue is whether the Plaintiff's pled facts, if

true, establish a constitutional or statutory violation.  Hope v. Pelzer, 536 U.S. 730, 736 (2002).

The Plaintiff has established that she has pled a cognizable First Amendment claim of retaliation.

Her comments were not in the classroom and the alleged disruptions in the classroom have

nothing to do with her claim.  The Plaintiff has met the first prong of the test.

The Second prong of the test is to establish whether the defendant's actions violated

"clearly established statutory or constitutional rights of which a reasonable person would have

known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  This can be  determined by whether

the current state of the law gives the Defendants a fair warning that retaliating by dismissing

Plaintiff from the program for lodging a discrimination grievance, was unconstitutional.  See,

Hope v. Pelzer, 536 U.S. 730, 736 (2002).   The answer to the question is clearly, yes.  The

Defendants knew or should have known that in 1999 a cause of action existed for discrimination.

The Defendants cannot take cover under the shield of immunity when their violation was so clear

and apparent.  The issue as to whether the Defendant had a "fair warning" that the conduct was

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net

offensive is established.  Saucier v. Katz, 533 U.S. 194 (2001).  The Defendants must be liable for their discriminatory actions.

CONCLUSION

Based on the foregoing discussion, the Plaintiff has established that there are genuine issues of material fact in dispute in that: 1) Plaintiff has met each and every element to establish her First Amendment Claim of Retaliation; 2) Plaintiff was not given proper due process or an opportunity to be heard regarding her expulsion; and 3) Qualified immunity does not apply to Defendant Bigelow and Defendant O'Donnell..  Summary Judgment must be denied.

FOR PLAINTIFF - Sakkara Bogle-Assegai

By _____
Cynthia R. Jennings, Esq. (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street - Bridgeport, CT 06604
(203) 334-4800 (O) - (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

20

## CERTIFICATION

This is to certify that the above Plaintiff's Memorandum of Law in

Opposition to Defendant's Motion for Summary Judgment was mailed by first

class mail to the following attorneys on February 16, 2004:

Nyle K. Davey,
Assistant Attorney General
Attorney General's Office
55 Elm Street (Annex 3rd Floor)
P.O. Box 120
Hartford, CT 06141-0120

Linda Yoder
Gary Starr
Shipman & Goodwin, LLP
One American Row
Hartford, CT  06103-2819

The Honorable Janet C. Hall
United States District Judge
United States District Court
915 Lafayette Boulevard
Bridgeport, CT  06604

Cynthia R. Jennings, Esq.

21

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800; (203) 368-6985 (FAX)
cynthia.Jennings@sbcglobal.net