FILED

UNITED STATES DISTRICT COURT 2005 FEB 10 P 3: 19
DISTRICT OF CONNECTICUT

U.S. DISTRICT COURT
NEW HAVEN, CT

SAKKARA BOGLE-ASSEGAI,          :
                 Plaintiff      :
                                :
                                :
         v.                     :
                                :
                                :
LISA MARIE BIGELOW, In Her      :
Individual Capacity             :
                 Defendant      :    Consolidated 3:01-CV-2366 (EBB)
                                     (Lead Case)

---

SAKKARA BOGLE-ASSEGAI, By Next :
Friend Femi Bogle Assegai,     :
                               :
                               :
         v.                    :    3:01-CV-2367 (EBB)
                               :
                               :
CAPITOL REGION EDUCATION       :
COUNSEL and MARK D. O'DONNELL  :
In His Official and Individual :
Capacities                     :

### RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [1]

### INTRODUCTION

The case against Capitol Region Education Council ("CREC")
and Mark D. O'Donnell (O'Donnell"), the Executive Director
thereof, in his official and individual capacities, originally
was filed on or about December 19, 2001, and assigned Civil
Action No. 3:01-CV-2367 (JCH).  A separate action raising the
same allegations was filed against Central Connecticut State

---

[1] As soon as Sakkara came of age, she became the sole Plaintiff in both
cases.

University ("CCSU"), and Lisa Marie Bigelow ("Bigelow"), in her official and individual capacities, Civil Action No. 3:01-CV-2366 (JCH). Upon the motion of CCSU and Bigelow, the Honorable Janet C. Hall issued a Ruling on a Motion to Dismiss that resulted in the dismissal of all claims against CCSU and Bigelow, in her official capacity only. The Plaintiff filed an Amended Complaint in both actions on February, 2002, which is the operative Complaint against CREC and O'Donnell. The complaint against CCSU and Bigelow was eventually amended in compliance with the Court's Ruling and CCSU was removed as a Defendant, along with any claims against Bigelow, in her official capacity. The cases were transferred to this Judge on February 25 and March 11, 2004. They were consolidated, with the lead case being that against CCSU and Bigelow.

In her Ruling, Judge Hall held that CCSU, a public school of higher education of the State of Connecticut, was not a "person" within the meaning of 42 U.S.C. Section 1983, inasmuch as its posture was the equivalent of the State of Connecticut itself. Hence, she dismissed the Section 1983 claim against this state actor. Further, because Bigelow was a state official holding the position of Assistant Director for CCSU's Center for International Education ("CIE"), the Court recognized that claims under Section 1983 against government officials in their official capacities must show that the entity's "policy or custom . . . played a part in the violation of federal law. Hafer v. Melo, 502 U.S. 21, 25 (1991)." As the Plaintiff had not alleged any

2

such facts, all Section 1983 claims were dismissed against
Bigelow in her official capacity only. (Count One). *Ruling on
Defendants' Motion to Dismiss* (February 10, 2003) at 7. The Court
next dismissed Plaintiff's claims against CCSU and Bigelow
brought pursuant to Title VII (Count Two). "Title VII actions
create procedures to `redress racial or sexual discrimination in
employment.'" *Id.* at 8 (citation omitted). Inasmuch as Plaintiff
was never in the "employ" of CCSU or Bigelow, her claims were not
viable. *Id.* at 8. The Court then turned to the conspiracy count
(Count Three) and, likewise, dismissed it, inasmuch as Plaintiff
had not pled any facts that, directly or indirectly, supported
her conclusory allegations that a conspiracy existed among CCSU,
Bigelow, CREC and O'Donnell. *Id.* at 10. Count Four, asserting
violations of three Connecticut statutes was also dismissed, with
the exception of one statute, Conn. Gen. Stat. Section 46a-75,
which the court held potentially viable as against Bigelow in her
individual capacity only. *Id.* at 10-14. The two other statutes,
Conn. Gen. Stat. Sections 46-60(a)(4) and (a)(5), were legally
barred, as both dealt with discrimination in the workplace, just
as did Plaintiff's Title VII claim. Finally, as to Count Five,
Judge Hall held that a claim of intentional infliction of
emotional distress against CCSU and Bigelow in her official
capacity was prohibited by the Eleventh Amendment; thus, the only
emotional distress claim which she permitted to proceed was that
against Bigelow in her individual capacity.

3

This Court now holds that Judge Hall's reasoning applies equally to Plaintiff's claims against CREC and O'Donnell.  CREC is a regional educational service center established pursuant to Section 10-66a, *et seq.* of the Connecticut General Statutes.

Section 10-66c defines a regional education service center as a "body corporate and politic" and provides further that "the board of a regional educational service center shall be a public educational authority acting on behalf of the State of Connecticut."  Hence, as an agent of the State, CREC is entitled to the same immunity as the State.  <u>Tobi Ann Brown v</u>. <u>Area Cooperative Educational Services</u>, Ruling on Motion to Dismiss at 2, 3:02-CV-1218 (WWE)(February 21, 2003)(regional services education center agent of state and protected by shield of Eleventh Amendment immunity). Resultingly,  CREC's Motion for Summary Judgment as to all claims against CREC, identical to those against CCSU, is hereby GRANTED.  The Motion regarding the claims against O'Donnell in his official capacity, is also GRANTED, as the reasoning of Judge Hall regarding Bigelow is equally applicable to O'Donnell, the Executive Director of CREC.

All Defendants now move for summary judgment on all remaining claims.  Defendants CREC and O'Donnell have adopted all moving papers of Bigelow, including her Memorandum of Law, the Statement of Undisputed Facts, and the plethora of Exhibits submitted therewith.  CREC and O'Donnell only add certain facts pertinent specifically to the claims against them.

4

### STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion.  The facts are distilled from the parties' Local Rule 56 Statements, exhibits thereto, and Memoranda of Law. [2]/

On July 5, 1999, forty-one high school students were admitted by CREC and enrolled in a nineteen-day-long program at CCSU's CIE, entitled 1999 Modern Pacific Asia Summer Program (the "Program").  Bigelow was the Program Director of the course.

Plaintiff was one of the members of the 1999 Program.  At the time, she was a sophomore at Bloomfield High school.  The Program was offered for three high school credits.  The decision whether to give course credit was in the discretion of the individual student's high school.  No one associated with the Program, including Bigelow, was empowered to authorize such credit, inasmuch as CCSU is not permitted to issue high school credits.  Affidavit of Susan Lesser, October 7, 2003, at ¶¶ 11, 12 ("Lesser Affidavit")

The Program, conceived and implemented by CREC, was designed to focus on issues related to the Pacific Asia area and to introduce high school students to college life, including staying overnight Sunday through Thursday in CCSU's Carroll Hall, returning home for Friday and Saturday nights.

On the evening of Monday, July 5, 1999, Plaintiff came to

_____

[2]/ *But see,* pages 15-24 herein, titled "Local Rule of Civil Procedure 56."

the CCSU campus to enroll in the Program and be assigned a
dormitory room.  She was accompanied by her mother, Femi Bogle-
Assegai ("Femi").  At that time, both Plaintiff and her mother
signed the Student Pledge, which stated that Plaintiff had read
and understood the "Community Rules and Expectations" and "Guide
to Living in Carroll Hall."  Further, Plaintiff pledged to uphold
all of the rules of the Program.

The academic portion of the Program began the next morning.
On Tuesday and Wednesday, Plaintiff attended separate classroom
lectures by Professors Fitzsimmons, Kyem and Marsh, and other
faculty members.[3]/

By late in the day on Wednesday, July 7, 1999, Professors
Fitzsimmons, Kyem, and Marsh had each, independently, gone to
Bigelow's office to register complaints about the classroom
conduct of Plaintiff and several other students.  Professor
Fitzsimmons was particularly adamant about the unacceptability of
Plaintiff's classroom conduct and her obvious disrespect for him.
He reported that Plaintiff failed to respond to at least three
directives from him to stop her disruptive classroom conduct.  He
further reported that on Wednesday, July 7, 1999, Plaintiff
entered his classroom wrapped in a bed sheet and disrupted the
class by beginning a discussion of how cold she was.

In fact, Professor Fitzsimmons then determined to tender his
resignation from the Program based on Plaintiff's thoroughly

---

[3]/ Marsh was also the Program's Academic Director.

6

disruptive conduct. CCSU's Associate Director in the Center for International Studies, Susan Lesser ("Lesser"), was also present in Bigelow's office when Professor Fitzsimmons lodged his complaints about Plaintiff and tendered his resignation based thereon. Lesser Affidavit at ¶ 25.

Professor Kyem came to discuss the fact that Plaintiff was one of a small group of students who were engaged in disruptive behaviors, including talking during lectures, passing notes, and attempting to divert the classes' attention to matters not being addressed at that time by him as the professor in charge.

Professor Marsh reported that Plaintiff consistently diverted class time from the topics being addressed by him during the morning classes of July 6, 7, and 8, 1999, by repeatedly going off on tangents, with no grounds or basis therefor, for five to ten minutes, each time in a confrontational manner. The effect was to distract the student body from Professor Marsh's lecture, yet she failed to stop her behavior after he, and her classmates, consistently asked her to do so.

By the end of that Wednesday, Bigelow had serious concerns about three particular students in the Program, including Plaintiff. Accordingly, she arranged a meeting for the next day, Thursday, July 8, from 11:30 a.m. to 12:30 p.m., with CREC's Executive Director (O'Donnell) and the Program's Academic Director (Marsh), in order to discuss these three students.

During the leisure hours of the evening of Wednesday, July 7, five male students played a game called "random." The idea

was to throw out random words, find them in a newspaper or magazine, cut them out, and paste them on a poster board.  The poster board was completed ("Random Poster") and placed on a bulletin board near the door of the Program's Residential Life Director, Kristopher Perrucio ("Perrucio"), in Carroll Hall.  As completed, the Random Poster read "cheese, random, porn, Catholic-Jew, sauerkraut, I am a green and purpley man."

Perrucio immediately removed it, discarded it, identified the five authors, and gave them a verbal warning.  He further counseled them on cultural sensitivity and told them not to hang up such items in a college environment.  Plaintiff did not personally see the Random Poster and acknowledged that she had no first hand knowledge of its contents.

Although the Random Poster had no direct impact on any classroom activity, lecture, discussion, or other learning activities of the Program, after Petruccio had reported the incident, the CIE's Director, Dr. George Eisen ("Eisen"), in conjunction with Lesser, made the decision to suspend classroom activities for Thursday afternoon and convene a "town meeting" of the whole student body to address the impact of the Random Poster and cultural sensitivity.

In the meantime, Bigelow, O'Donnell, and Marsh went forward with their Thursday morning meeting. During this meeting, it was determined that Plaintiff and two other students ("Student #2"; Student #3") would be dismissed from the Program for continual behavioral problems.  It was further decided that such dismissals

8

would be implemented late Friday afternoon, when the parents
arrived to pick up their children for the week end.  Bigelow
would meet with each student and his or her parents, explain the
on-going situation, and give them full opportunity to respond at
that time.  Following input from the students and their parents,
it would then be in her discretion as to whether to allow the
student to remain in the Program, or whether dismissal was in the
best interests of the Program.  Following this noontime meeting,
Bigelow left the campus, to which she did not return until Friday
morning.

Due to the time constraints of a nineteen-day-long Program,
and because the timely notice by mail was not feasible, Bigelow
did not provide formal written notice of the proposed action to
the three students or their respective parents prior to the
meetings.  Rather, she prepared the dismissal letters Friday
morning.  She planned to give them oral notice of the proposed
dismissal and give each participant and his or her parents an
informal opportunity to respond prior to making a final decision.

In the meantime, the "town meeting" went forward on Thursday
afternoon.  The authors of the Random Poster apologized to the
entire student body and declared that they never intended to
offend anyone.  Although she had not seen it, Plaintiff spoke out
at the town meeting about the cultural insensitivity of the
Random Poster.[4]/  At no time during the town meeting did any

---

[4]/ Although Plaintiff acknowledged in her deposition that the Random
Poster was the solitary writing discussed at the Town Meeting, she next

staff member or student make any reference to the words "nigger",
"Puerto Ricans", "Jews", or "whites" in the context of the Random
Poster or otherwise.  Further, at no time did anyone even make a
vague reference to a second poster.  No one remotely described
the Random Poster as containing the phrases "Niggers and Puerto
Ricans out, Jew out, Whites are the best."

Yet, on Friday morning, rumor of such a second poster
surfaced (the "Rumor Poster").  Plaintiff did not see the Rumor
Poster, nor did any one else come forward to report that he or
she had seen it. No staff member saw such a second poster, nor
did anyone complain to any staff member that he or she had.  An
in-depth investigation by the CCSU police department later
determined that it was, in fact, a mere rumor, and that no such
second poster had ever existed.

Plaintiff's parents arrived at CCSU at approximately 4:30

---

averred that her challenges to racial slurs were to the alleged second, the
so-called Rumor Poster.  The Court believes that the passage of time was at
the root of this confusing and hazy testimony, as Plaintiff later acknowledged
that she not heard anything about a Rumor Poster until late on Thursday
evening, hours after the Town Meeting had been terminated.  She testified that
she thought that "friends" on the "boys' side" of the dorm had told her about
the racially-charged Rumor Poster and its alleged existence  on Thursday
evening.  Plaintiff testified that she did in fact call her parents late
Thursday night and that she told them about its existence at that time.  All
others testified that it was only the Random Poster which had ever been
discussed at the Town Meeting, and no other reference, no matter how vague,
had ever been made to a second poster. *See e.g.*, Defendants' Response to
Plaintiff's Interrogatories ("Defendants' Response"), July 28, 2003 at ¶¶ 17,
21.  Plaintiff's Deposition (June 19, 2003) at p.48 -51, 60, 161, 195-96, 199-
201; Lesser Affidavit, the facilitator of the town meeting,  at ¶¶ 65-75;
Deposition of Kenneth Peruccio, (head of residential life program, it was he
who found the Random Poster) pp.31-32, 35, 55-56, 57.  Plaintiff has not
provided the Court with any affidavits of those "friends" who told her about
the existence of the Rumor poster. Thus, any attempted testimony on her part
regarding same would be disallowed as inadmissible hearsay.

p.m. on Friday afternoon, demanding an immediate meeting with
Bigelow. The meeting was held in an office at the Residential
Life dormitory.  In addition to Plaintiff, her parents and
Bigelow, also in attendance were Lesser and the Assistant
Director of Residential Life, Kim London ("London").

Plaintiff's father, Kuba Assegai ("Kuba"), initiated the
meeting with angry comments directed at Bigelow that CCSU and its
President were racist and had been for a long time. Although
Bigelow tried to interject the issue of Plaintiff's classroom
conduct, Kuba's verbal presentation only escalated and,
initially, he paid no attention to what was being said to him.
Once Bigelow was able to be heard on the issue of Plaintiff's
dismissal, Kuba physically approached Bigelow with a rolled-up
magazine, which he shook in her face, while loudly proclaiming,
"I'll get you, you bitch." *See* Statement of Susan Lesser to CCSU
Police Dep't at p. 2 (July 13, 1999); CCSU Response to CHRO
Complaint at 12, prepared by CCSU Director of Affirmative Action
(February 10, 2000); CCSU Police Department's Report: Incident of
Alleged Harassment (July 9, 1999). He stated, in a loud,
aggressive manner, that his daughter would never disrupt a
classroom, disregarding the numerous reports to the contrary, and
that the CCSU environment was not suitable for her.

Based on the clearly futile conversation with her parents,
and Plaintiff's failure to account for or apologize for her now-
uncontradicted classroom behavior, Bigelow gave the written
notice of dismissal to Plaintiff's mother, finding that it was

11

not in the best interests of Plaintiff or her classmates for Plaintiff to remain in the Program.  Kuba, without even unsealing the letter, threw it back on Bigelow's desk.  Although Bigelow was willing to continue the meeting, one or both of Plaintiff's parents abruptly announced that they were leaving and did so.[5]/

By letter dated July 10, 1999, Plaintiff's mother, Femi, sent a letter to O'Donnell that was critical of Bigelow, demanded that a variety of programmatic changes be made, and that Plaintiff be reinstated.[6]/  Although Femi failed to allege in this letter that the phrase "Niggers and Puerto Ricans out, Jews out, Whites are the best" was posted in the dormitory, she did so in a complaint filed with the CCSU Police Department on July 10, referring to it as a "hate crime."  It was this complaint which instigated the in-depth investigation referred to above by this police department, which found no evidence that the "rumor" poster had ever existed.  The police department also made the finding that the Random Poster was not "racially charged" as

---

[5]/ Bigelow next met, separately, with Students #2 and #3 and their respective parents.  Again, she began the meeting with an oral notice of intent to dismiss and discussed with each family the behavioral concerns of each student as expressed by staff members.  Bigelow found that both students wanted to stay in the program with promised behavioral changes.  Full support of each student's respective parents in improving their child's behavior was also given.  Bigelow, accordingly, never gave them the written notices of dismissal, but allowed them to remain in the program.  Both students completed the program.

[6]/ Both the letters to O'Donnell and the CCSU Police Department were returned to Femi for lack of proper postage.  The actual dates of their final receipt are unknown.

12

alleged by Femi.[7]/

On December 27, 1999, Kuba filed a complaint, on behalf of the Plaintiff, with the CHRO, against CCSU and its President. The complaint alleged discrimination based on race (African); national origin (British); age (14); being expelled from a dwelling; being expelled from an educational program; and, retaliation against Plaintiff for having previously opposed discriminatory conduct. The complaint further alleged that "a racial graffiti" incident by five white students had resulted in the phrase: "Niggers out, Puerto Ricans out, Jews out. Whites are best." CCSU denied all of the allegations and Plaintiff's father filed an extensive rebuttal.[8]/ However, before the CHRO could issue its ruling on probable cause, Plaintiff's father requested a release of jurisdiction, which release was granted to commence an action in State Superior Court. The present federal actions are the result of such release.

The remaining claims, set forth against Bigelow and

---

[7]/ Femi testified that she had never seen either poster.

[8]/ On February 8, 2001, during a fact finding held by the CHRO's investigator, Kuba, again, spontaneously commenced loud, disruptive behavior and acted in a threatening manner toward Bigelow. Affidavit of Lisa Marie Bigelow at ¶¶ 153-156; Lesser Affidavit at ¶¶ 148-152. Further, Kuba refused to be deposed in this case at any time. "After reading your slanderous and depraved questioning of my daughter, Ms. Sakkara Bogle-Assegai, of the 19th & 20th June 6243 (2003) deposition, I have concluded that it is in neither of our interest to meet each other at this time." E-mail to Assistant Attorney General Nyle Davey (July 7, 2003), first sentence. He next warned Attorney Davey that "[a]lso, please note that any further violation of my 'Private Property' by any agent acting on your behalf will be met with the maximum penalties under 'Capitalist laws.'" Id. at ¶ 2.

O'Donnell in their individual capacities only,[9]/ are as follows:
(A). First Claim for Relief - - First Amendment, pursuant to 42
U.S.C. § 1983. In her Amended Complaint, Plaintiff contends that
the Rumor Poster, not the Random Poster, had been put up on a
bulletin board in the men's side of the dormitory on Wednesday
night and that her voicing her concerns about, and in opposition
to, the direct expressions of racial hatred by young Caucasian
men who were also participants in the Program was the true reason
for her dismissal from the Program, and had nothing whatever to
do with any behavioral problems, as reported by her professors.
First Amended Complaint (February 13, 2002) at ¶¶ 12, 16, 17, 20,
21; Fourth Amended Complaint (July 11, 2003) at ¶¶ 9, 13, 14, 16,
21. [10]/

   (B). The Second Claim for Relief is entitled "42 U.S.C.
2000e Section 1983" and contends that her rights to due process
under both the federal and state Constitutions were violated by
the manner in which her dismissal from the Program took place.

---

[9]/ *See* Footnote 1, herein, granting summary judgment in favor of CREC
with regard to all claims brought against it, and in favor of O'Donnell as to
any claim brought against him in his official capacity.

[10]/ The First Amended Complaint presently contains the operative
pleadings against O'Donnell, which have never been altered throughout any
version of Plaintiff's original and amended filings.  The Fourth Amended
Complaint is in response to Judge Hall's decision on Defendants' (CCSU and
Bigelow's) Motion to Dismiss. Due to this Court's ruling herein, *see* footnote
1, there no longer exist any viable claims as against CREC. With regard to
O'Donnell, this Court has found itself in full agreement with the rationale of
Judge Hall in her Ruling and, resultingly, there remain no viable claims
against O'Donnell in his official capacity. Accordingly, the sole claims
remaining number four, each brought against Bigelow and O'Donnell in their
individual capacities only.

First Amended Complaint at ¶¶ 25, 26; Fourth Amended Complaint at ¶¶ 25, 26.

(C). Plaintiff's Third Claim for Relief has its genesis in Section 46a-75 of the Connecticut General Statutes, entitled "Discrimination In Educational and Vocational Programs Prohibited." Plaintiff alleges that her dismissal from the Program when the creators of the "Random Poster" were not dismissed constituted a discriminatory act in violation of said statute. First Amended Complaint at ¶ 29; Fourth Amended Complaint at ¶ 29.

(D). Plaintiff's final claim against O'Donnell and Bigelow, in their individual capacities, is the intentional infliction of emotional distress. First Amended Complaint at ¶¶ 33-35; Fourth Amended Complaint at ¶¶ 33-35

**LEGAL ANALYSIS**

I.    **The Standard of Review**

A.    **Local Rule of Civil Procedure 56**

Local Rule 56(a)1 imposes, on a party moving for summary judgment, the requirement of annexing to the motion for summary judgment a document entitled "Local Rule 56(a)1 Statement, which sets forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Local Rule 56(a)2 places a parallel burden upon the resisting party to include a statement which sets forth, in separately numbered paragraphs corresponding

15

to the paragraphs contained in the Rule 56(a)1 Statement, whether each of the facts asserted by the moving party is admitted or denied.    Local Rule 56(a)2 also requires the opposing party to include in her Local Rule 56(a)2 Statement, in a separate section, her claimed "Disputed Issues of Material Fact", which must consist of a list of each issue of material fact as to which she contends there is a genuine issue to be tried.

Subsection (a)3 of Local Rule 56 provides that "[e]ach statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, **must be followed by a specific citation to the affidavit of a witness competent to testify as to the facts at trial and/or evidence that would be admissible at trial.**" (emphasis added)

The purpose of a Rule 56(a)2 Statement is to make affirmative statements which will aid and inform the Court. In the present case, however, Plaintiff has denied 51 statements out of a total of 163 statements. Each denied statement is critical to the substantive analysis of this case.  Yet, lacking in each instance, is the citation of authority upon which the denial is based.  Apparently, Plaintiff expects the Court to comb the record for such authority, which search the Court declines to perform.  Resultantly, section 1 of Plaintiff's Local Rule 56(a)2 Statement is in non-compliance with the mandates of the Local Rule and the Court hereby holds that each denial, lacking any

16

support therefor, is hereby deemed admitted for purposes of decision herein. *See* Local Rule 56(a)1 (the facts set forth by the moving party in accordance with that Rule **shall** be deemed admitted unless controverted by the opposing party in accordance with Rule 56(a)2). *Accord* <u>Dusanenko v. Maloney</u>, 726 F.2d 82, 84 (2d Cir. 1984)(no filing in compliance with local rule; grant of summary judgment affirmed); <u>Wyler v. United States</u>, 725 F.2d 156, 158 (2d Cir. 1983)(same); <u>Kusnitz v. Yale University School of Medicine</u>, 3:96-CV-02434 (EBB)(July 16, 1998)(same); <u>Corn v. Protective Life Ins. Co.</u>, 1998 WL 51783 (D.Conn. February 4, 1998)(same); <u>Peterson v. Saraceni</u>, 1997 WL 409527 (D.Conn. July 16, 1997)(same); <u>Burrell v. Lucas</u>, 1992 WL 336763 (D.Conn. Oct. 14, 1992)(same) <u>Soto v. Meachum</u>, 1991 WL 218481 (D.Conn. August 28, 1991)(same).

Then, too, there exist significant defects in section two of Plaintiff's Local Rule 56(a)2 Statement, entitled "Plaintiff's Material Facts in Dispute", in that a majority of the facts are not supported by admissible evidence, the "evidence" cited to support same is either non-existent or taken completely out of context.[11]/ The following are an assortment of examples:

**Statement 2. "This is a direct untruth. Defendant is**

---

[11]/ There is no individual citation as to each Exhibit attached to Plaintiff's Statement. Rather, one needs to go to the Table of Contents in order to determine exactly what the Exhibit is. When one goes to the Exhibit listed in the Table of Contents, one finds one or two pages, with no label thereon, leaving the Court to determine on its own the significance of the Exhibit.

misrepresenting Plaintiff's deposition."   (See Exhibit 20.)

The Court has no idea what the "direct untruth" referred to is.  Statement 2 does not correlate with Statement 2 of Defendants' Local Rule 56(a)1 Statement, nor anything else the Court is aware of. Accordingly, Statement 2 is rendered nonsensical.

**Statement 4.  Plaintiff was not disruptive.   (See Exhibits "C" & "D").**

Exhibits C and D are portions of the deposition of Professor Marsh.  On those pages, as underlined by Plaintiff,  he testifies, " [S]he seemed to treat me with respect. . . She never exhibited a behavior which I would consider rude, calling me names, for instance, outwardly disregarding any statement I made to her, instead she would frame it into some kind of debate which I would consider confrontational, perhaps even aggressive, but not necessarily rude."  Plaintiff does not cite the next sentence, in which March stated, "Argumentatively, she would aggressively pursue a point, she would argue with me over say the validity of a statement I made in terms of to be quiet or to pay attention, so forth but she did it in a way that was more discussing it with me, though in an aggressive fashion based on her tone of voice, the speed at which she spoke to me, the short bursts, so forth . . . ."

On the first page of Exhibit D, Plaintiff underlines the last part of a paragraph of Marsh's testimony:"not that she was threatening in any manner, but she had a lot of zeal to her discussion which I did not necessarily have a problem with."

The first sentence of the paragraph reads "I would say yes, she was confrontational." The paragraph following Plaintiff's underlining reads: "My main issue was that it was tangential and when I tried to explain it to her, that we had to move on, it seemed to hold things back." On the next page, it reads: "In this case, this also happened, other students were not really getting involved, most of the students seemed to want to move on with the discussion and said a few things to Sakkara saying, you know, Shhh, Shhh, why are you - - why are you talking like that ? That's just - - let's move on. Even, shut up."

It is beyond cavil that, in the entire context of Marsh's testimony, he made it clear that Plaintiff was a troublesome student. During his deposition of August 3, 2000, he also testified:

> p. 18-19 She would debate with me, question the
> concepts, question the material I was
> presenting her and there was - - this
> did not facilitate discussion in the
> classroom because the debates she would
> engage in were not well grounded . . .
> [S]he would come out with a sentence
> or so that was controversial and
> well-founded, but upon deeper inspection
> it was not founded, not based on anything
> . . . But these things were tangential and
> would distract us from our main objective.

Marsh also testified as to behavior he noticed during the

19

breaks in the class.

> p. 26-27  But the striking component of this was in
> the little breaks that we would have, I
> noticed her talking to the other students
> and it seemed that she was saying very
> provocative things to these students. One
> thing in particular she said was we - -
> we are getting treated like this because
> we are Latino or we're African-American
> or what have you.  She seemed to be trying
> to form some little type of group
> consciousness among this little group of
> students in the back of the room that they
> were being singled out for some gender,
> racial, ethnic, or other reason, not for
> the fact that they were being disruptive
> to the classroom which is the reason why
> we had to address them and speak with them.

**Statement 10.  The Program Director had particular concerns,
including the concern of inappropriate materials being posted on
School property that could have been and was perceived as
detrimental and racially motivated.  (See Exhibit G).**

Exhibit G purports to be page five of a sixteen-page
affidavit of Bigelow.  However, a review thereof quickly reveals
that the page is not from Bigelow's affidavit.  It is not the job
of this Court to review the approximately 4-500 pages of
Plaintiff's exhibits in an attempt to discern the source of
Plaintiff's claim.  The Statement is not one of material fact, in
any event.

One of Plaintiff's most offensive attempts to mislead this

20

Court - - and there are many - - is found in Statement 11.

Statement 11. Kristopher Perrucio, MPASP Program Assistant, saw the poster that was on the wall. (See Exhibit "23"). The poster is alleged to have had the words "Jews out, Negroes out" written on it. Kristopher Perrucio stated, " . . . it could be construed as racist, someone could take offense at it." (See Exhibit "23")

It is true that Perrucio found the random poster. Deposition of Kristopher Perrucio, August 3, 2000, at 18. It is also true that he believed someone could find it racist. *Id.* at 19. ***WHAT IS COMPLETELY FALSE IS THAT THE POSTER ABOUT WHICH PERRUCIO WAS TESTIFYING EVER CONTAINED THE WORDS "JEWS OUT, NEGROES OUT", YET THE MANNER IN WHICH THIS STATEMENT IS WRITTEN INVITES NO OTHER CONCLUSION.***

As to this rumor poster, Perrucio testified as follows:

> "About the other poster ? I know as much
> about the poster as you do in terms of I
> had never seen the poster, never. None of
> my staff had ever seen the paper, none of
> my students told me they seen [sic] a poster.
> I mean, I don't know what was on it, how big
> it was, where it was, when it was. I have
> no knowledge of the second poster.

*Id.* at 30.

Statement 20.  The letter of dismissal for Sakkara dated July 9, 1999, and signed by Lisa Bigelow, (See Exhibit "26") states that Dr. O'Donnell was in agreement with the expulsion and so the matter was closed (See Exhibit "32").

What the letter actually said, in the final paragraph, was: "Dr Mark O'Donnell, Director of the Quality and Diversity program at the Capitol Region Education Council, is aware of and supports this decision.  Though he is out of town for the weekend, he will be available to speak with you on Monday morning.  He may be reached at (860) 524-4079."  These words are the antithesis of the matter being "closed".  As to Exhibit 32, cited in support for the claim that the "matter was closed", the exhibit consists of a Grant Application FY 1999-2000 to the State Department of Education for the following year's Program.  The Court is, yet again, nonplussed.

Statement 29.  Plaintiff, [sic] expressed her views on the treatment of Black and Latino students to Lisa Bigelow, Susan Lesser, Professors and her student colleagues.  (see Exhibit "V" and Exhibit "W").  These views were expressed in the Town meeting and to Lisa Bigelow and Susan Lesser as administrators directly. (see Exhibit "V" and Exhibit "W").  Plaintiff followed the rules of the program by contacting management with regard to the manner

22

in which Black and Latino student participants of the program were being treated (see Exhibit "W").  Plaintiff did as she was instructed.  Plaintiff complained to Lisa Bigelow.  (See Exhibit "2")

Exhibits V and W are two pages from a 17-page Affidavit of Lesser.   Exhibit V has two paragraphs underlined by Plaintiff. The first, paragraph 64, avers that "Sakkara spoke during the `town meeting' on Thursday and expressed her view about the cultural insensitivity of the `random' posting."  The second, paragraph 67, states: "During the `town meeting,' Sakkara thought that the `random' poster participants that [sic] the Program should have kicked them out and they were not kicked out because they were white."  Exhibit W has one paragraph underlined, number 119, which reads: "Lisa Marie Bigelow had previously reported to me that the sealed envelope contained a letter pertaining to dismissing Sakkara from the Program."  Exhibit "2" is Plaintiff's unsupported deposition testimony.

These citations are not admissible evidence for the broad propositions for which they allegedly stand.  To voice concerns about the cultural insensitivity of the "random poster" is most certainly not an overriding condemnation of the manner in which minority students were being treated throughout the entire Program and, after combing the record for supporting, admissible

23

evidence of this claim, the Court finds that the record is bereft
of such evidence.  The only "evidence" is the self-serving
testimony of Plaintiff and her mother themselves.[12]/ Plaintiff's
opinion regarding the fate of the random participants is just
that - - an opinion, a speculative inadmissible claim.

Further, neither Exhibit refers at all, in any manner, to
Sakkara's claim that she went to Bigelow to seek dismissal of the
random participants.  First, Bigelow's name is not to be found
anywhere in Exhibit V.  As to Exhibit W, page 13 of Lesser's
affidavit, the document is a 13-paragraph description of the
dismissal meeting on the evening of July 9, 1999.  What relevance
this Exhibit has to Statement 29 is not fathomable.


Finally, the Court holds that the following are not material
facts which create a genuine issue to be tried, as none are
material under the substantive law and cannot affect the outcome
of this litigation under such substantive law:

Facts 1, 3, the last three sentences of Fact # 4, 7, 8, 9,
the last sentence of Fact # 14, the last sentence of Fact # 15,

---

[12]/ Sakkara, for the first time, testified that the random poster
participants should have been dismissed from the program because all of them
wore all black clothing, long black coats, and chains and that this was not
long after Columbine.  She testified further that she did not feel "safe" with
these persons in the Program.  Deposition of Sakkara Bogle-Assagai, June 19,
2003, at 73-74.   The record is devoid of any representations of this nature
made during the time at issue herein.
    Femi testified that the only thing that happened at the meeting during
which Sakkara was dismissed was the announcement of said dismissal by Bigelow,
and that her husband did not speak during the meeting until they were leaving.
"Nothing happened."  Deposition of Femi Bogle-Assagai, December 19, 2002, at
55-56.

16, 22, 23, 25, 26, 27, 28, 31, the last two sentences of Fact #
32, 33, 35, the last two sentences of Fact # 37, 38, 39, 41, 43,
48.

### B.  **Federal Rule of Civil Procedure 56**

In a motion for summary judgment the burden is on the moving
party to establish that there are no genuine issues of material
fact in dispute and that it is entitled to judgment as a matter
of law.  Fed. R. Civ. P. 56(c).  *See also* <u>Anderson v. Liberty
Lobby</u>, 477 U.S. 242, 256 (1986)(plaintiff must present
affirmative evidence in order to defeat a properly supported
motion for summary judgment).

If the nonmoving party has failed to make a sufficient
showing on an essential element of her case with respect to which
she has the burden of proof at trial, then summary judgment is
appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).
"In such a situation, there can be `no genuine issue as to any
material fact,' since a complete failure of proof concerning an
essential element of the nonmoving party's case necessarily
renders all other facts immaterial."  *Id.* at 322-23.  *Accord,*
<u>Goenaga v. March of Dimes Birth Defects Foundation</u>, 51 F.3d 14,
18 (2d. Cir. 1995)(movant's burden satisfied if it can point to
an absence of evidence to support an essential element of
nonmoving party's claim). It is also true that, if the nonmoving
party submits evidence which is "merely colorable", or is not
"significantly probative," summary judgment may be granted under

25