such a circumstance. Anderson, 477 U.S. at 249-52 (scintilla of evidence in support of plaintiff's position insufficient; there must be evidence from which a jury could reasonably find in his favor).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S.at 247-48 (emphasis in original).

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless that such cases may involve state of mind or intent. "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat

26

an otherwise valid motion. Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

## II. The Standard As Applied

### A. The First Amendment Claim

First Amendment rights, applied in the light of the special characteristics of a school environment, are available to students. "It can hardly be argued that . . . students . . . shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines School District, 393 U.S. 503, 506 (1968). On the other hand, student conduct which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of free speech." *Id.* at 513.

"The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially acceptable behavior." Bethel School District No. 403 v. Fraser, 478 U.S. 675, 681 (1985)(speech inappropriate in an educational setting not protected speech, even if permitted elsewhere). *Accord* New

Jersey v. T.L.O., 469 U.S. 325, 340-342 (1985)(constitutional rights of students in public schools not automatically coextensive with the rights of adults in other settings). Indeed, the Supreme Court has long recognized the special characteristics of the school environment in relationship to constitutional rights and the need to control the conduct of students. "Otherwise, the schools would be unduly constrained from fulfilling their role as `a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.'" Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 272 (1987), quoting Brown v. Board of Education, 347 U.S. 483, 493 (1954).

Educators are in a better position than are the courts to determine what manner of speech in the classroom or in school assembly is inappropriate. Bethel School Dist., 478 U.S. at 683. In the present case, it was those educators who determined that Plaintiff's behavioral problems were inappropriate and, if the intolerable situation could not be dealt with at the hearing among staff, Plaintiff, and her parents, she was to be dismissed in the best interests of the Program. Due to the highly volatile conduct of Plaintiff's father, nothing was accomplished at the meeting which would have permitted Plaintiff to stay in the program.

Bigelow's decision was not an unfounded one. As early as the second day of classes, three professors came to her to

28

complain about Plaintiff's classroom behavior. Bigelow felt it serious enough to call for a meeting to discuss Plaintiff's conduct (and that of Students #2 and #3) and whether dismissal was in the best interests of the Program. As the Court of Appeals for the Second Circuit has reiterated, "[w]e will not second-guess the [Program's] view that excluding [Plaintiff] from campus was the most appropriate method of promoting the [Program's] interest in this case." Rosenfeld v. Ketter, 820 F.2d 38, 39 (2d Cir. 1987)(plaintiff could participate in any political activity, speaking on any subject or assembling with any group, but not on the university campus; restriction de minimus and in university's best interest in keeping peace on campus). No violation of Plaintiff's First Amendment rights occurred here, as her speech and behavior in the classrooms were disruptive and not "protected speech", as a matter of law.

Regardless of a plethora of supporting evidence to the contrary, Plaintiff continues to insist that the Random Poster had the terms "Niggers out, Puerto Ricans out, Jews out. Whites are best" written on it. Thus, she pleads, when she spoke up at the town meeting on discrimination and racial bigotry, her dismissal only then became a foregone conclusion. Again, against all uncontradicted evidence, Plaintiff tries to claim that Bigelow, O'Donnell, and Marsh met **after** the town meeting and it was not until that evening that it was determined to dismiss her. Plaintiff's Memorandum of Law at p. 5. She then writes: "[t]herefore, merely hours after the Plaintiff engaged in a

29

protected activity in complaining about a racially hostile environment, the Defendant[s] made a decision to dismiss the Plaintiff from the program. (Exhibit W)" When one goes to Exhibit W, one finds one page out of the entire Lesser affidavit, which, bewilderingly, lacks **any** relevance to the sentence for which it is cited.[13]/

> To survive summary dismissal, a plaintiff asserting [a] First Amendment retaliation claim[] must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001)

While it is true that dismissal from the Program was an adverse action, Plaintiff has submitted no credible evidence that she was dismissed for speaking out against racism, as opposed to the myriad of evidence demonstrating that she was dismissed due to her classroom behavioral problems. Her memorandum of law is often legally unsound, as are many of her inexplicable citations to her exhibits.

In sum, this Court will not interfere with the educators' decision, which it, in any event, finds well-founded by the entire record.

B. **The Due Process Claim**

---

[13]/ Unfortunately, this is not a singletary issue, which has made this Court's job ever-more time consuming.

In Plaintiff's Second Claim for Relief she alleges that Bigelow and O'Donnell were responsible for her dismissal from the Program, which dismissal occurred absent due process. "As a result of Plaintiff's dismissal from the Program, she was deprived of scholastic credits and the entire educational experience." First Amended Complaint at ¶¶ 26-29; Fourth Amended Complaint at ¶¶ 24-27.

Under federal law, "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected." San Antonio School District v. Rodriquez. 411 U.S. 1, 35 (1972). Hence, Plaintiff's federal Due Process claim, brought pursuant to the United States Constitution under the aegis of Section 1983, fails. "[Section] 1983 merely provides a mechanism for enforcing individual rights `secured' elsewhere, i.e., rights independently `secured by the Constitution and laws' of the United States. `One cannot go into court and claim a "violation of § 1983" - - for § 1983 by itself does not protect anyone against anything.'" Gonzaga University v. Doe, 536 U.S. 273, 285 (2002), citing Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 617 (1979). Thus, inasmuch as there exists no constitutionally recognized right to an education under the United States Constitution, the Court holds that Plaintiff has no federal due process rights which could have been violated by Defendants.

The Connecticut Constitution does create a constitutional

31

right to a free public education, emanating from Article 8, Section 1.[14]/ This Section vests each child with an entitlement from the town in which he or she resides to not less than 180 days of school each academic year, as established in Section 10-16 of the General Statutes. However, this right does not include the months of July and August, the exact time frame during which the 19-day Program was offered. *See* Drahan v. Board of Education of Regional School District No. 18, 42 Conn.App. 480, 495, appeal den'd, 239 Conn. 921 (1996). *See also* Conn.Gen.Stat. § 10-151(a)(7), which provides: "The term 'school month' means any calendar month other than July or August . . . ."

Further, the Program was not offered by her local educational agency nor by an agency vested with authority to grant her academic credit (i.e., her own local educational agency). The Program was organized by CREC, a regional educational services center established by the authority of Sections 10-66a, et seq., of the Connecticut General Statutes. Those sections delineating the powers of the Board of each regional educational services center, Sections 10-66c(a)-(h), are highly comprehensive and inclusive, and nowhere permit or authorize the Board to offer scholastic credit for completion of any program furnished by it. This silence is of utmost import, as the legislature is deemed to be fully aware of the language it

---

[14]/ Article 8, Section 1, does not, however, create a right in favor of a student to choose a particular program at a particular school and attend it as a right. Savage v. Aronson, 214 Conn. 256, 286-87 (1990).

uses to implement the overall intention of a statute it has drafted.

Although Judge Hall recognized that "[t]he facts alleged by the plaintiff meet the minimal standard required under Rule 12(b)(6), for she alleges that no procedures were followed prior to her expulsion", she did not opine as to the level of due process required to dismiss a student from an abbreviated 19-day long educational Program. *Ruling on Motion to Dismiss*, Doc. No. 32 (February 10, 2003) at 8-9.[15]/

Plaintiff urges this Court to hold that, pursuant to the Supreme Court case of <u>Board of Regents v. Roth</u>, 408 U.S. 564 (1971), she had a legitimate property interest in completing the Program, which interest was violated by her manner of dismissal. The seminal rule announced in <u>Roth</u>, however, is in complete contradistinction to Plaintiff's claim. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. [S]he must have more than a unilateral expectation of it. [S]he must, instead, have a legitimate claim of entitlement to it." *Id.* at 577 (non-tenured professor with one-year contact had no property right in being rehired for next school year). *See* <u>Savage</u>, 214 Conn. 286-87

---

[15]/ Judge Hall wrote that she could not find "a single case that holds that a participant in a voluntary, four-week summer program has a due process right under the Fourteenth Amendment before being expelled from that program." *Id.* Likewise, this Court cannot find such a case under the Connecticut Constitution or the enabling statutes which govern Plaintiff's due process claim herein.

33

(Connecticut Constitution does not create entitlement for student to choose particular program at particular school and attend it as a right).

Plaintiff contends that she had a legitimate property interest in completing the Program and the potential receipt of three course credits from her high school. Such contention is a pristine example of an "abstract need or desire." Any entitlement to seek the academic credits from Bloomfield High School could not possibly vest, as she herself recognizes, until she completed the Program. She gained no cognizable property interest simply by enrolling in the Program and, even after enrolling, she could, at best, have a mere expectation of completion and credits given.

The Court, however, will assume, that by being accepted and enrolling in the Program, minimal due process rights were warranted. The Court holds that such rights were met under the circumstances of this case.

Plaintiff claims, and Bigelow concedes, that the formal steps as set forth in the Student Handbook were not followed. Although Bigelow herself had written the disciplinary rules prior to the beginning of any of the CIE programs, she quickly recognized that, in terms of the limited-time programs offered, the requirement of written notice, prior to an opportunity to be heard, was simply not workable, but required more immediate and decisive decision-making. The Court agrees, however, that even if the formal terms were not complied with, Defendants still

complied with the process which was due herein.

When finally permitted to speak, following the initial verbal barrage by Kuba, Bigelow succinctly advised Plaintiff and her parents that, due to severe discipline problems, reported as early as the second day of classes by three separate teachers, Plaintiff was to be dismissed from the Program. She gave them full opportunity to be heard on the issue, but Kuba began his verbal assault again, vehemently denying that his daughter could ever be a discipline problem, and refusing to even contemplate a discussion on the subject. After being subjected to Kuba's continuing conduct. Bigelow realized that neither Plaintiff nor her parents were going to take her offered opportunity to discuss the teachers' complaints and a possible resolution thereof. She then took the written letter of dismissal from her desk drawer and gave it to Femi. Without opening it, Kuba took the letter from his wife, and threw it back on Bigelow's desk. All three then abruptly left the room.

In her opposing papers, Plaintiff asserts that she should have been given the same due process that was given Students #2 and #3, and their respective parents. See n.5, supra. In fact, that is exactly what Bigelow and the other staff members in attendance attempted to do. That Plaintiff and her parents deliberately chose not to utilize the notice and opportunity to be heard as did the other two students and their respective

35

parents will not be laid at the feet of Defendants.[16]/

"All that is necessary is that the [due process] procedures, be tailored, in light of the decision to be made, to the `capacities and the circumstances of those who are to be heard.'" Goldberg v. Kelly, 397 U.S. 254, 268-69 (1970), *quoted in* Mathews v. Eldridge, 424 U.S. 319, 349 (1975). Both highly educated individuals, Kuba and Femi simply determined to turn blind eyes and deaf ears to the reality of the Program concerns regarding their daughter. This was their choice, albeit a narrow-minded one.[17]/

Plaintiff has suffered no due process violation in this case.

### C. Discrimination under Conn.Gen.Stat. Section 46a-75

Section 46a-75 is a sweeping public policy statement of the Connecticut legislature, providing that all educational programs of any nature are to be open to all qualified persons, without

---

[16]/ O'Donnell agreed, at the Thursday lunch meeting with Bigelow and Marsh, to the dismissal of three students, including Plaintiff, due to behavioral problems. He also agreed that, dependent upon the responses of the respective students and their parents at the open-ended meetings Bigelow would hold with them at pick-up time on Friday, Bigelow had the discretion whether to permit the students to remain in the Program. Plaintiff's claims against O'Donnell are essentially derivative of those against Bigelow, as he agreed to Plaintiff's dismissal should Bigelow determine it in the best interests of the Program, and, at a later (unknown) date, declined to intervene by reinstating Plaintiff. Plainly, there is no cognizable due process violation in O'Donnell's conduct.

[17]/ Through out all of her moving papers, Plaintiff is described as a "talented and gifted student." Thus, just as her parents were fully capable of understanding and discussing the behavioral charges set forth against their daughter, Plaintiff herself was equally capable of so doing. She gave no indication that such was a path that she had any interest in, either.

36

regard to race, color, religious creed, sex, marital status, age, national origin, ancestry, mental retardation, mental disability, learning disability or physical disability, including, but not limited to, blindness. Subsection (b) provides that each program is to be conducted to encourage the fullest development of the interests, aptitudes, skills and capacities of all students . . . with special attention "to the problems of the culturally deprived, educationally handicapped, learning disabled, [and] economically disadvantaged. . . ." Subsection (c) is drafted to "encourage expansion" under these programs "so as to involve larger numbers of participants from those segments of the labor force where the need for upgrading levels of skill is greatest."

The Court holds that no cause of action for discrimination lies under this expansive statement of public policy. Plaintiff attempts to transmogrify her dismissal as a discriminatory, due process violation of this public policy statement, which statement exists to endorse the highest standards for all Connecticut schools. First Amended Complaint at ¶¶ 32-35; Fourth Amended Complaint at ¶¶ 29-31. Plaintiff, clinging to the discredited claim that she was dismissed in retaliation for complaining of discriminatory actions,[18]/ makes the leap that, accordingly, something *must* have been wrong with the Program and, in some nebulous manner, Bigelow and O'Donnell *must* have violated

---

[18]/ The Court again notes that the decision to dismiss Plaintiff on Thursday morning occurred **prior** to the town meeting. Thus, it is legally impossible for Plaintiff to rely on any statements or claims made at that meeting as a basis for her alleged retaliatory dismissal claim.

37

the statute. The claim is devoid of factual or legal merit.

### D. The Intentional Infliction of Emotional Distress

Although Defendants assert that Plaintiff's claim for the intentional infliction of emotional distress has been abandoned as not briefed, the Court will, nevertheless, briefly consider the claims as pleaded against Bigelow and O'Donnell.

In order to succeed on a claim for intentional infliction of emotional distress, Plaintiff must establish the following: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." Appleton v. Stonington Bd. of Ed., 254 Conn. 205, 210 (2000), citing Petyan v. Ellis, 200 Conn. 243, 253 (1986). In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but also must allege facts sufficient to support them. See Meyers v. Bunker Ramo Corp., No. B-90-506 (JAC), 1992 U.S. Dist. LEXIS 5336, at *26 (D. Conn. 1992). Because this Court finds that Defendants' alleged conduct was not "extreme and outrageous," the other three elements will not be addressed.

Whether Defendants' conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the Court. See Johnson v. Cheesebrough-Ponds

38

USA Co., 918 F.Supp. 543, 552 (D. Conn.), aff'd, 104 F.2d 355 (2d Cir. 1996), citing Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 18 (Conn. Super. Ct. 1991). Only where "reasonable minds differ," does it become a question for the jury. Reed v. Signode Corp., 652 F. Supp. 129, 137 (D. Conn. 1986); see also Restatement (Second) of Torts § 46, cmt. (h) (1965). The general rule "is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." Mellaly, 42 Conn. Supp. at 19-20, quoting W. Prosser & W. Keeton, Torts § 12, at 60 (5th ed. 1984); see also Restatement (Second) of Torts § 46, cmt. (d) (1965) ("Liability has been found only where the conduct had been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.") [19]/ "[M]ere insults, indignities, or annoyances that are not extreme or outrageous will not suffice." Brown v. Ellis, 40 Conn. Supp. 165, 167 (Conn. Super. Ct. 1984).

In the present case, Plaintiff simply parrots the key phrases of the Appleton Court and its progeny. She contends "the

---

[19] "In interpreting what constitutes 'extreme and outrageous' conduct, Connecticut courts have relied on the Restatement (Second) of Torts §46, comment (d) (1965). . . ." Thompson v. Service Merchandise, Inc., No. 3:96CV1602 (GLG), 1998 U.S. Dist. LEXIS 13669, at *4 (D. Conn. 1998). See also Appleton, 254 Conn. at 210; Petyan, 200 Conn. at 254.

39

acts" of Bigelow and O'Donnell (with no further elaboration thereon) were taken "for the sole purpose of causing serious physical injuries or inconvenience, and causing Plaintiff severe emotional distress and anguish." Plaintiff summarizes her claim with no factual background; but mere legal conclusions: "Defendants' actions were extreme and outrageous in that Bigelow and O'Donnell exercised their power in an abusive, retaliatory and discriminatory manner to dismiss Plaintiff from the Program." This Court, however, finds that these allegations do not satisfy the stringent requirements of the nature of "extreme and outrageous conduct", as required under the law of this jurisdiction. Conclusory allegations, devoid of any factual support, are legally unacceptable.

Indeed, courts in Connecticut have been extremely reluctant to allow a claim for intentional infliction of emotional distress. See, e.g., Dollard v. Board of Educ., 63 Conn.App. 550, 554 (2001) (plaintiff's claim of concerted plan to force plaintiff to resign or become so distraught as to have reason to terminate her does not rise to intentional infliction of emotional distress claim); See, e.g., Appleton, 254 Conn. at 211 (finding allegations that school officials made derogatory comments concerning plaintiff's work performance and his ability to read, in front of other employees, contacted plaintiff's daughter to recommend that plaintiff take some time off because he was acting erratically, and arranged to have him escorted by police off of school property insufficiently extreme or

40

outrageous to state a cause of action); <u>Emanuele v. Baccaccio & Susanin</u>, Civ. No. 379367, 1994 Conn. Super. LEXIS 3156, at *6 (Conn. Super. Ct., Apr. 10, 1992) (holding conduct not extreme and outrageous where at-will employee alleged her employer made false accusations regarding her work performance, and used coercion, threats and intimidation to force her to sign a document against her will, all for the purpose of depriving her of benefits and compensation); <u>Rock v. Mott Metallurgical Corp.</u>, CV990492215S, 2001 Conn. Super. LEXIS 207, at *13-21 (Conn. Super. Ct., Jan. 10, 2001) (granting defendant's motion for summary judgment where plaintiff alleged that she was ordered to lift and carry heavy objects beyond her ability, was required to work without being supplied the necessary resources, was transferred to a work station without a chair or desk, was called names, and was falsely accused of not finishing her work, because in totality the acts were "less than `extreme' and `outrageous' in nature").

Similarly, federal district courts in this district have interpreted the qualification of extreme and outrageous strictly. *See, e.g.*, <u>Reed v. Signode Corporation</u>, 652 F. Supp. 129, 137 (D. Conn. 1986) (holding conduct not extreme and outrageous where a uniform company policy that forbade leaves of absences was applied to an employee seeking a leave to undergo chemotherapy treatments for cancer); <u>Lopez-Salerno v. Hartford Fire Ins.</u>, No. 3:97CV273 (AHN), 1997 U.S. Dist. LEXIS 19724, at *19 (D. Conn., Dec. 8, 1997) (granting motion to dismiss where plaintiff alleged

41

she was terminated so that defendant could avoid giving her long-term disability benefits); <u>Thompson</u>, 1998 U.S. Dist. LEXIS 13669, at *2-3 (granting motion for summary judgment and finding that allegations made by plaintiff of employer denigrating her race, removing her responsibilities in order to undermine her authority, and failing to provide adequate supervision and sufficient staff to do her job, did not constitute extreme and outrageous conduct); <u>Armstead v. Stop & Shop Cos.</u>, 2003 U.S.Dist. Lexis 4107 at * 14-15 (D.Conn. March 17, 2003)(dismissing intentional infliction of emotional distress claim, holding that "claims of employer misconduct in the form of intentional discrimination or retaliation, including discharge, which challenge motive or intent, are dismissed unless the manifesting conduct is extreme and outrageous."); <u>Harhay v. Blanchette</u>, 160 F.Supp.2d 306, 315 (D.Conn. 2001)(termination of employee, even when accompanied by other aggravating factors, does not itself give rise to a claim for intentional infliction of emotional distress); <u>White v. Martin,</u> 23 F.Supp.2d 203, 208 (D.Conn. 1998)(general allegations of discrimination. . . and harassment "fall short of misconduct which exceeds `all bounds usually tolerated by a decent society'".); <u>Thomas v. St. Francis Hosp. & Med. Ctr.</u>, 990 F.Supp. 81, 92 (D.Conn. 1998)(verbal warnings, suspension, and termination may have resulted in hurt feelings, but were insufficient to support claim of intentional infliction of emotional distress); <u>Johnson v. Cheeseborough-Pond's USA Co.</u>, 918 F.Supp. 543, 551 (D.Conn. 1996)(negative performance reviews,

42

sudden termination, and being physically escorted from premises not actionable as intentional infliction of emotional distress).

Applying the appropriate stringent standards in light of such precedents, the Court finds that Defendants' conduct, as alleged in the First and Fourth Amended Complaints, falls far short of that which "exceeds all bounds of decency" and is not extreme and outrageous.

## CONCLUSION

In this case, there are no *genuine* issues of *material* fact which are required to be sorted out by a jury. Since there exists a complete failure of proof concerning all essential elements of Plaintiff's case, this necessarily renders all other facts immaterial. No reasonable jury could find in Plaintiff's favor, as there exists not a scintilla of credible, admissible evidence in support of any of her positions as taken.

Accordingly, the Motions for Summary Judgment [Doc.Nos. 58 and 64] shall be, and hereby are, GRANTED IN THEIR ENTIRETY AS TO DEFENDANTS CAPITOL REGION EDUCATIONAL COUNCIL, LISA M. BIGELOW and MARK D. O'DONNELL. The Clerk is directed to close these cases.

SO ORDERED

ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this /6th day of February, 2005.

43