## AFFIDAVIT OF MARK STAPLETON

I, Mark Stapleton, having been sworn, depose and say:

1. I am over eighteen years of age and believe in the obligation of an oath. This affidavit is based upon my personal knowledge.

2. I am an attorney admitted to practice law in the State of Connecticut.

3. I am currently employed by the State of Connecticut as Chief of the Office of Legal and Governmental Affairs of the State of Connecticut Department of Education, and have been so employed since March 1980, except for the period of November 1988 through August 1989;

4. In my position as Chief of the Office of Legal and Governmental Affairs, I have become familiar with the statutes governing the creation and operation of regional education service centers ("RESCs"), and with the manner of operation of those entities;

5. RESCs are established by local boards of education and their boards are comprised of members of members of the local boards by which they are created;

EXHIBIT C

6. Pursuant to § 10-66b of the Connecticut General Statutes, responsibility for the operation and management of each RESC lies with its board, not with the State Department of Education.

7. Employees of RESCs are not state employees, and the Department of Education does not participate in any way in the hiring, promotion or termination of those employees, in the determination of their compensation, or in any other personnel matter;

8. Although RESCs receive some grant money from the State for administrative purposes, their primary source of funding is fees paid to the centers by the local districts by which they were formed, for the services provided by the RESCs;

9. The State does not monitor the budget of the RESC other than the normal monitoring done of a recipient of a State grant;

10. The boards of RESCs are required to file with the State Department of Education many of the same reports that local boards of education are required to file and are generally perceived and treated by the State Department of Education in the same manner as a local or regional board of education;

11. RESCs are not subject to the state code of ethics with which state agencies must comply;

12. If RESCs were state agencies, they would be prohibited by Public Act 02-46 from retaining the lobbyists who they currently employ.

13. RESCs may, and do, maintain a cash balance from year to year, which state agencies may not;

14. I have read the above statements and they are true and accurate to the best of my knowledge.

Mark A. Stapleton

STATE OF CONNECTICUT          )
                              ) ss. Hartford
COUNTY OF HARTFORD            )

Sworn and subscribed before me on this 4th day of February, 2005.

                                          Karen M. Flanagan
                                          Juris. # 100727
                                          Commissioner of the Superior Court

OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CONNECTICUT
[NO NUMBER IN ORIGINAL]

1990 Conn. AG LEXIS 25

June 28, 1990

CORE TERMS: surety, political subdivision, board of directors, executive director, instrumentality, chairperson, cooperate, execute

REQUESTBY:
[*1]
James B. Holmes, Chairman
State Insurance Purchasing Board
55 Elm Street
Hartford, CT 06106

OPINIONBY:
Clarine Nardi Riddle, Attorney General; Shelagh P. McClure, Assistant Attorney General

OPINION:

This letter is in response to your request for advice concerning the State Insurance Purchasing Board's authority to obtain surety bonds for members of the board of directors of the Connecticut Convention Center Authority.

The Connecticut Convention Center Authority ("Authority") was created by 1989 Conn. Pub. Acts 89-381. Section 4(a) of the Act states:

There is created a body politic and corporate to be known as the "Connecticut Convention Center Authority." Said authority shall be a public instrumentality and political subdivision of this state and the exercise by the authority of the powers conferred by this act shall be deemed and held to be the performance of an essential public and governmental function. The Connecticut Convention Center Authority shall not be construed to be a department, institution or agency of the state.

Under Section 4(d) of the Act, each member of the board of directors of the Authority and the executive director of the Authority are required to execute surety bonds[*2] or "in lieu thereof, the chairperson of the board shall execute a blanket position bond covering each member, the executive director and the employees of the authority . . . ."

The statutory duties of the Insurance Purchasing Board ("Board") are set forth at *Conn. Gen. Stat. § 4a-20*. Section 4a-20 provides in part: "Said board shall determine the method by which the state shall insure itself against losses by the purchase of insurance governed by the provisions of chapters 678 and 682a and sections 38-176 to 38-182 [relating to surety bonds], inclusive, to obtain the broadest coverage at the most reasonable cost." (Emphasis added). Since the text of 1989 Conn. Pub. Acts 89-381 § 4(a) states that the Authority is not a department, institution or agency of the State, but is a "public instrumentality and political subdivision" of the state the question is whether that is the equivalent of "the state" for purposes of the Board's authority to obtain surety bonds.

In *State ex rel. Maisano v. Mitchell, 155 Conn. 256 (1967),* the Connecticut Supreme Court discussed the meaning of the term "political subdivision":

"'The term "political subdivision" is broad and comprehensive[*3] and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and the inherent necessities of government have always been regarded as

EXHIBIT D

public.'" *Commissioner of Internal Revenue v. Shamberg's Estate*, 144 F.2d 998, 1004 (2d Cir.) (quoting from *30 Opp. Atty. Gen.* 252, 253 [U.S. 1914]; *Commissioner of Internal Revenue v. White's Estate*, 144 F.2d 1019, 1020 (2d Cir.).

Id. at 263-64. For example, cities, towns and boroughs are political subdivisions of the State. *Dugas v. Beauregard*, 155 Conn. 573 (1967).

Although the Authority is a political subdivision of the State, the language in Public Act 89-381 indicates that it is an entity distinct from the State. As indicated previously, the Act expressly states that the Authority is not a department, institution or agency of the State. See Section 4(a).

The Act declares that "bonds notes or other obligations" of the Authority issued by the Authority to finance its operations "shall not be deemed to constitute a debt or liability of the state," and shall so state [*4] on their face. Section 7(g). Rights and properties acquired by the Authority "pass to and [be] vested in the state" only when the existence of the Authority is terminated by law. Section 4(f). Section 6 prescribes the adoption of "procedures" by the Authority, which is a process separate and distinct from the regulation-making process required for state agencies under the Uniform Administrative Procedures Act, *Conn. Gen. Stat. § 4-166* et seq. Among the procedures to be adopted are procedures for the "hiring, dismissing, promoting and compensating employees of the authority," Section 6(a)(2), indicating that existing laws and regulations pertaining to state employees do not apply to employees of the Authority. Under Section 4(c) the board of directors is directed to "be accountable to and cooperate with the state whenever, pursuant to this act, the state may audit the authority or the project or at any other time as the state may inquire as to either, including allowing the state reasonable access to the project and records of the authority . . . ." Such a provision would be redundant if the authority were encompassed within "the state," as it would direct the State to [*5]cooperate with itself and allow itself access to its own property and records.

The foregoing provisions demonstrate that the Connecticut Convention Center Authority has been created as a public entity separate and distinct from the State. Accordingly, it is our conclusion that it is not within the authority of the Insurance Purchasing Board to obtain surety bonds for the directors of the Authority. This is in accord with a previous opinion to the Insurance Purchasing Board in which we concluded the Board was not authorized to purchase insurance for the Connecticut Resources Recovery Authority. See 74 Conn. Op. Atty. Gen. (9/25/74).

Although the Insurance Purchasing Board is not authorized to purchase surety bonds for the directors of the Connecticut Convention Center Authority, the chairperson of the board of directors of the Authority is empowered under the Act to obtain the necessary bonding. Section 4(d). The approval procedure for such surety bonds also is outlined in Section 4(d).

We trust that this is responsive to your inquiry.

OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CONNECTICUT
[NO NUMBER IN ORIGINAL]

1982 Conn. AG LEXIS 103

December 27, 1982

CORE TERMS: housing authority, political subdivision, state agency, governmental function, local government, subordinate, enumerated, prescribed, funding, entity, municipality, advice

REQUESTBY:
[*1]
Douglas S. Lloyd, M.D., M.P.H.
Commissioner, Department of Health Services
79 Elm Street
Hartford, Connecticut 06106

OPINIONBY:
Carl R. Ajello, Attorney General; Stanley K. Peck, Assistant Attorney General

OPINION:

This will acknowledge and respond to your request for advice concerning the proper interpretation of Public Act 79-410, now codified as *Conn. Gen. Stat. § 1-21b*.

*Conn. Gen. Stat. § 1-21b (b)* provides in part as follows:

No person shall smoke: (1) in any room in a building owned or leased by the state or any political subdivision thereof (a) while a governmental meeting is in progress in such room or (B) where such room is open to the general public and used primarily as a reception or waiting room.

The question asked is whether a housing authority must post appropriate signs and prohibit smoking at its meetings in the manner provided by the above-cited statute.

It is clear from the supplemental materials attached to the request for advice that the meetings in question are held at premises owned by a housing authority. This being the case, our analysis necessarily revolves around whether a housing authority is an "agency of the state or any political subdivision thereof."

"Political[*2] subdivision" has been defined as follows:

The attributes which are generally regarded as distinctive of a political subdivision are that it exists for the purpose of discharging some function of local government, that it has a prescribed area, and that it possesses authority for subordinate self-government through officers selected by it. See *Sachem's Head Property Owners' Assn. v. Guilford*, 112 Conn. 515, 517, 152 A. 877; *State ex rel. Malkin v. McMahon*, 88 Conn. 461, 463, 469, 91 A. 445; 1 McQuillin, Municipal Corporations (3d Ed.) § 2.07.

*Dugas v. Beauregard*, 155 Conn. 573, 578 (1967).

While a housing authority arguably discharges some functions of local government and operates in a prescribed area, it does not possess the authority for "subordinate self government." A housing authority is a public body corporate and politic; *Conn. Gen. Stat. §§ 8-40, 8-44*; and has only those powers enumerated in § 8-44 to carry out the purposes of Chapter 128 of the Connecticut General Statutes. It follows that a housing authority is not a political subdivision of the

EXHIBIT E

state. This view is consistent with that taken by courts in other jurisdictions. Mount Vernon Housing Authority [*3] v. American Motorists Insurance Co., 21 A.D. 2d 788, 250 N.Y.S.2d 479, 480 (1964); Lloyd v. Twin Falls Housing Authority, 113 P.2d 1102, 1104 (1941); Ohio Citizens Trust Co. v. Evatt, 146 Ohio St. 30, 63 N.E.2d 912 (1949); as well as a prior opinion of this office. Opinion of the Attorney General, June 29, 1979, addressed to Deputy Commissioner David W. Deakin.

Similarly, a housing authority is not an agency of the State of Connecticut. The determinative features were recently enumerated by our State Supreme Court, as follows:

(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement; and (4) whether the entity was created by the government. [Citations omitted].

Board of Trustees of Woodstock Academy, et al. v. Freedom of Information Commission, et al., 181 Conn. 544, 554 (1980).

While it is true that a housing authority engages in a governmental function by providing housing, such function is carried out pursuant to a contractual arrangement with the State. Conn. Gen. Stat. § 8-44a(a). This is quite unlike usual funding arrangements which involve budget review and legislative [*4] appropriations to a state agency.

Conn. Gen. Stat. § 8-52 provides that a "housing authority shall have the power to issue bonds." Such bonds, however, are "not...obligations of the municipality or of the state or any political subdivision thereof." If the legislature had intended that a housing authority be an agency of the state, it seems likely that it would have backed its bonds with "the full faith and credit of the State of Connecticut", rather than explicitly providing otherwise. See opinion of Attorney General, December 18, 1974, addressed to Anthony S. Keller, Executive Director of the Commission on the Arts.

A housing authority is not created by the state. While state statute defines "housing authority", one can only be established by a municipal body. Conn. Gen. Stat. § 8-40. The chief executive officer of such municipality appoints the housing authority commissioners and is required to choose members of the local community. Conn. Gen. Stat. § 8-41. Unlike the commissioner of a state agency, a housing authority commissioner is not appointed by the governor. See Conn. Gen. Stat. § 4-12.

In sum, the statutory scheme by which a housing authority exists and operates [*5] is insufficient to bestow upon it the status of either "state agency" or "political subdivision thereof." Conn. Gen. Stat. § 1-21b (b). Therefore a housing authority is not subject to the provisions of Conn. Gen. Stat. § 1-21b (b).



**State of Connecticut**

Robert K. Killian
ATTORNEY GENERAL

Office of The Attorney General
30 TRINITY STREET
HARTFORD 06115

Telephone number
566-4990

December 18, 1974

Connecticut Commission on the Arts
340 Capitol Avenue
Hartford, Connecticut 06106

Attention:  Mr. Anthony S. Keller
            Executive Director

Gentlemen:

In your letter of July 24, 1974 you request advice to a number of questions. The first question asked is whether the Commission on the Arts has the authority to contract with an independent publisher to develop a program as outlined in the proposal of Pequot Press, Inc.

The proposal by Pequot Press, Inc. states the general plan would be to create a continuing, well-planned, high-quality, publishing program for the Commission "which after sufficient initial funding and start-up time, could be self-generating." In effect the suggestion is for a "Commission on the Arts Press" with Pequot Press, Inc. providing the staff and technical resources. The Commission would perform the publication selection for each book in the series and editorial supervision. An initial funding requirement of at least two years apparently would be needed before the series could be expected to be self-generating to allow continuation of the series over a significant period of time. Each publication would be part of a series. In Pequot's view this arrangement would necessitate a contract in the neighborhood of five years.

Public Act 74-210 which became effective on October 1, 1974 clarifies the authority of the Commission and its effect should be considered. Section 10-370, Conn. Gen. Stat., as amended, now states that for the purpose of fostering the arts, the Commission "may join or contract with consultants, private patrons, individual artists and ensembles and with institutions, local sponsoring organizations and professional organizations."

EXHIBIT F

The types of organizations listed, which the Commission may contract with, do not include profit making corporations and it is clear the type of contractual arrangement of the nature described above was not intended by the Legislature under Section 10-370, Conn. Gen. Stat., as it has been amended to be so included. Neither can the authority granted the Commission under Section 10-371, Conn. Gen. Stat., as amended, be so construed.

On the other hand, the authority of the Connecticut Foundation for the Arts is not so limited, since Public Act 73-575, Section 1 states:

> "The purpose of said corporation shall be to supplement funds available to the Connecticut Commission on the Arts and for that purpose to receive private, public, federal, and State contributions, gifts and grants,... loans, and to utilize its funds and assets to assist, foster, and encourage within the state through the agency of said commission, the participation in, and promotion, development and appreciation of artistic and cultural activities...."

Although the provisions of Public Act 73-575 speak in terms which indicate that this non-profit corporation was primarily established to grant or loan money, the Board of Directors has been granted the authority by Section 4(f) of Public Act 73-575 to:

> "...perform such other acts as may be necessary or appropriate to carry out effectively the objectives and purposes of the corporation."

It is our opinion that, based on the above provisions, the Connecticut Foundation for the Arts has the statutory authority to enter into a contractual arrangement to effect the purpose of the Pequot proposal subject to a proper determination by its Board of Directors that such an agreement is "appropriate to carry out effectively the objective and purposes of the corporation" and the restrictions outlined below.

Your letter of July 24, 1974 also requests advice as to the application of the State's bidding procedures to such a contract. The applicability of Part III of Chapter 50, Section 4-108, et seq. Conn. Gen. Stat., as amended, is determined by a consideration of the Foundation's status, that is, its relationship with the State of Connecticut.

In general terms the Connecticut Arts Foundation must be considered a creature or instrumentality of the State of Connecticut notwithstanding its own corporate entity. Although the Connecticut courts have not passed directly on the question, federal courts and other

jurisdictions have indicated that considerations relating to the function, operation and purpose of the organization are the determinative factors.

First consider the purpose of the Foundation as quoted supra; the Foundation is to supplement the funds of the Commission and to utilize its funds and assets to assist and encourage, etc., "through the agency of said commission" the arts within the State. In other words, the Foundation was created by the Legislature as a supplement to the Commission charging it with the same basic purpose as the Commission, which legislative purpose is without question a legitimate function of the State government.

Other provisions of Public Act 73-575 indicate the close intermingling of the State of Connecticut through its various officers and the Commission, with the corporate Foundation. Section 3 details that the Board of Directors of the Foundation is to include, by virtue of their office, the Treasurer of the State of Connecticut and the executive director of the Commission and also eight members selected by the Commission. Section 6 states that the Commissioner of Public Works is to provide without charge, office space, etc., to the corporation upon request. Section 7 grants the corporation exemption from taxes and assessments. Section 8 charges the Treasurer of the State with maintenance of the corporation books without charge, through the facilities of his office and the state auditors of public accounts are to annually audit the corporation's books.

Two provisions relating to the Foundation's operation are particularly indicative of its status. First, Section 1 of Public Act 73-575 exempts the corporation from the provisions of Chapter 600, Chapter 600, Section 33-423 et seq., Conn. Gen. Stat., as amended, sets out the statutory requirements for the formation of a non-profit corporation and its administration. Second, Section 10(c) grants the State Treasurer authority to issue and sell notes "of the State" in behalf of the Foundation and further:

"Such notes shall be general obligations of the state and the full faith and credit of the State of Connecticut is pledged for the payment of interest thereon as the same may become due and the payment of the principal thereof at maturity."

The above factors constitute facts and circumstances, as the United States Supreme Court stated in Evans v. Newton, 382 U.S. 299, 86 S.Ct. 488, 489 (1965), which determine the degree of state involvement. In the cited case this Court, in finding state action in a discrimination case, wrote "[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies and instrumentalities of the State...."

<mark>

Commission on the Arts
December 16, 1974
Page 4

In an analogous situation to the Connecticut Foundation, the 4th United States Circuit Court of Appeals found that a North Carolina Park Commission set up as a body "politic and corporate" was not set up as an ordinary corporation but as an agency of the State of North Carolina to exercise sovereign powers in behalf of the State and in its name. The Court reasoned that the essence of this public office was the Commission's duty of performing an "agency" function; that is, of doing some act or series of acts for the State. This is similar to the Connecticut Foundation performing acts for the State of Connecticut, through the State Commission on the Arts. As the Court stated in that decision, Suncrest Lumber Co. v. North Carolina Park Commission, 29 F.2d 823, 825 (1928):

> "The members of the commission act in behalf of the State, and the fact that the commission is incorporated does not deprive them of their character as state officers."

Recently a similar result was found in a slightly different context in Gilmore v. James, 274 F.Supp. 75 (N.D. Texas 1967).

The above facts and judicial determinations lead to the conclusion that the Connecticut Foundation for the Arts is an instrumentality of some type of the State of Connecticut. This conclusion and the obvious financial interest of the State of Connecticut as evident in Public Act 73-575 leads to an affirmative answer to the question of whether the Foundation is entitled to legal representation by the Attorney General by virtue of Section 3-125, Conn. Gen. Stat., as amended.

The above discussion is a necessary prelude to the question of this Foundation's obligation to follow the bidding procedures of Chapter 50, Part III, Conn. Gen. Stat., as amended.

Section 4-109, Conn. Gen. Stat., as amended, defines the term "state agency" as used in Chapter 50, Part III, and those bodies coming within its terms are required to adhere to that part's requirements for purchases and printing. The provision states:

> "When used in this part, unless the context indicates a different meaning, 'state agency' includes any officer, department, board, council, commission, institution or other agency of the executive department of the state government;...."

By the inclusion of commission in the above provision, clearly the Commission on the Arts itself must comply with the bidding requirements for procurements. The Connecticut Foundation for the Arts is required through Section 1 of Public Act 73-575 to

assist, foster and encourage the arts "through the agency of the commission." This agency of the Foundation to the Commission is concretely established by Section 3 of Public Act 73-575 by which its Board of Directors includes, as we noted above, the State Treasurer, the Executive Director of the Commission, and eight members appointed by the Commission serving at the pleasure of the Commission and the provision of Section 4(a) of said act. By Section 4(a), each exercise of the Foundation's primary function, that is providing grants and making loans, must be approved by the Commission. Based on the specific provisions discussed above and the general intermingling of functions between the Foundation and the Commission by the Legislature, it seems clear that the Legislature's use of the term "agency" as quoted above must be given effect. It is a well-settled criterion of statutory construction that no words of a statute should be treated as superfluous or insignificant. Archibald v. Sullivan, 152 Conn. 663, 668.

The above leads to the necessary conclusion that the Foundation, with its unique authority and capacity for certain purposes, is in the nature of an appendage to the Commission. Being in that relationship, the Foundation must comply with the statutory requirements the Commission is subject to, which specifically includes those set out in Sections 4-108 through 4-124, Conn. Gen. Stat., as amended, for purchases and printing (Chapter 50) unless specific exceptions appear in the Foundation's statutory grant.

Two principles of statutory construction apply for these considerations. First, if there are two enactments, one general and one specific, the specific is ordinarily considered as an exception to the general. Bartholomew F. Guida et al v. Public Utilities Commission et al, 35 CLJ No. 45 p. 8, May 7, 1974. This is particularly true when the second rule of construction is applied, that is, when two legislative enactments are in conflict, the latter repeals the former to the extent of the repugnance. Moran v. Bens, 144 Conn. 27, 30, 127A.2d 42. Gennero Pizzola et al v. Planning and Zoning Commission of the Town of Plainville et al, 36 CLJ No. 9 p. 2, August 27, 1974. In the present situation, the effect of these principles is that the general provision of Section 4-120, Conn. Gen. Stat., as amended, which mandates that all printing revenue be placed in the general fund, would be negated by Sections 8 and 9 of Public Act 73-575, if the Foundation's Board of Directors authorize the institution and management of a separate fund by the State Treasurer. In addition, if the funding by the Foundation is obtained through a special appropriation of the Legislature, the exception, as stated in the final sentence of Section 4-120, Conn. Gen. Stat., would apply, and said section in total would be excepted.

Connecticut Commission on the Arts
December 18, 1974
Page 6.

However, other provisions of Chapter 50, it should be pointed out, must be complied with by virtue of the absence of any specific exemption in the Foundation's authority. These include Section 4-117 and Section 4-119, Conn. Gen. Stat., as amended, which are particularly germane to the question of publishing.

Very truly yours,

Robert K. Killian
Attorney General

By _____
Richard J. Lynch
Assistant Attorney General

RJL:esd



*About CREC*

- about
- purpose
- directions
- administration
- facts
- members
- edu-links
- human resources

CREC Programs A-Z

## What is CREC?

*Legally,* the Capitol Region Education Council is a Regional Educational Service Center (RESC) established under CT General Statute 10-66 a-n. Through the legislation, Connecticut permits local boards of education to establish a RESC as a "public educational authority" for the purpose of "cooperative action to furnish programs and services." Such intermediate units - that are smaller than a State Educational Agency (SEA), but larger than a Local Educational Agency (LEA) - are used as service delivery mechanisms in more than 75 percent of the states.

*Practically,* the Capitol Region Education Council is supported by the educational community when it can meet recognized needs with higher quality and/or lower cost programs and services than can LEAs working in isolation.

*Financially,* the Capitol Region Education Council is supported by local, state, federal and private funds. LEAs become members of CREC with an annual fee of .20/pupil. Each CREC program has a discreetly funded budget which totally supports it and contributes a proportionate share to CREC's overall management and development.

*Strategically,* the Capitol Region Education Council is one bridge between the State Education Agency and the CREC-member LEAs. The bridge attempts to transcend the gap that exists between the leadership and monitoring functions of the SEA and the heavy direct service responsibilities of local public education in the Capitol Region. CREC is one of six RESCs that provide services throughout Connecticut.

*Specifically,* the Capitol Region Education Council provides real services to meet real needs.

### WHAT IS CREC TO ITS DISTRICTS? [more info]

welcome | about | news | divisions | training | jobs | links | Search...

*Capitol Region Education Council*
111 Charter Oak Avenue / Hartford, CT 06106 / 860 247-2732 Fax 860 246-3304 / Directions
© Copyright 2000-2004

EXHIBIT G